[Crim. No. 2953.    Fourth Dist., Div. One.    June 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. LLOYD WOODROW BEACH, JR., Defendant and Appellant.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Lloyd Woodrow Beach, Jr., in pro. per., and Charles G. Warner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Lola M. McAlpin, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Defendant appeals from a judgment sentencing him to prison for the term prescribed by law following his conviction of murder in the first degree of Jean Marie Moungey in a nonjury trial in which the trial court found defendant to have been sane at the time of the offense.

The trial was upon the issues raised by pleas of not guilty and not guilty by reason of insanity. By stipulation, the evidence presented on the issue of guilt was enlarged to include that bearing on both issues, and both issues were submitted for decision upon such evidence, and following the conviction the issue of penalty was similarly submitted.

Prior to trial there was a hearing before a jury pursuant to section 1368, Penal Code, in which the jury unanimously found defendant mentally capable of standing trial.

Thereafter, defendant waived his right to be tried by a jury.

On March 30, 1967, Jean Marie Moungey, aged 25, left the home of her mother in Sun Valley to go to San Diego to look for employment. She intended to return on March 31, or, should she spend a night with a woman friend in Pomona, on April 1. At that time she had with her about $75 in cash; she did not carry a suitcase. She was taken to the bus station by her brother. At about 3 p.m. on March 31, she left a bar in Oceanside in company with a man named Lloyd, later identified as defendant, who had offered to drive her to Los

Angeles. She was quoted as saying that at that time she had her return trip bus ticket with her.

While in the bar she had been seated next to defendant; later another woman, Sylvia Bathe, came in and joined in the conversation with Jean Marie and defendant. Defendant and Jean Marie appeared to be friendly; there was, however, no physical contact between them in the bar.

On April 3, 1967, Jean Marie's dead body was discovered in a ravine, 50 to 75 feet below a 10-foot-wide dirt road near South Laguna Beach. The body was found in an area to the left and slightly in front of a pile of construction trash which consisted of cement, plaster, wire, boards (including two by fours) and other similar items.

There was a pathway about two feet wide in which the weeds and plant growth had been knocked down which ended where the deceased's body was found, and which could have been caused by the dragging or sliding of a body. The body, lying face up, was partially covered by shrubbery, was badly bruised and the left side of the victim's head and face had been crushed.

The features were so badly battered, the skull so broken, that neither the mother nor the brother of the woman could identify her face. The blows must have been several in number, by a heavy instrument with at least one unrounded corner, such as a wooden two by four. Both arms were broken. There was blood under the body. The lower portion of the body was completely uncovered and the legs were pointed upward toward the road. Seminal fluid was found in the vagina and elsewhere in the genital area. The victim's skirt and slip had been pushed or rolled up; her buttocks were lying on top of a pair of underpants, of which only a corner was observable when the body was found, and which had been ripped out at the crotch and torn away. Striation of plant material appeared on the underpants and on a ripped and inverted girdle which was found halfway down the hill. There were two buttons missing from the two-piece blue dress worn by the deceased, one of which was found on the roadway above about nine feet from the edge.

At the edge of the road was a pair of sunglasses, opened out, which the deceased had had with her when she left her mother's house.

A watch, two pieces of a watch-band, and a pearl were found approximately two feet from the body of the deceased; a ring from which the pearl had come was on the left hand of

the deceased. A piece of a partial denture plate was found near the head of the body and another piece was found near the right arm of the body. Two red shoes and a garter clip were found a few feet apart on the slope above the body. A pair of nylons and a girdle were found on the slope about half-way down from the roadway and three or four feet above the shoes.

Jean Marie had never married; since her return to California in December 1966 she had no particular male friend; she had been engaged to marry someone in the Midwest but the engagement had been broken off.

She was two to three months pregnant at the time of death; the approximate date of death was March 31.

The Orange County Sheriff's Department obtained information that the "Lloyd" of the bar-room encounter was defendant, who lived in Oceanside. The deputies saw defendant at his home, from which he went with them to a nearby coffee shop. Defendant identified a picture of the victim as a woman he had met in a bar and also who had asked him to drive her to Los Angeles. He first told the deputies that outside the bar the victim changed her mind and went with two other men. Defendant was not then a suspect.

Defendant gave consent to an examination of his car by two men from the sheriff's department crime laboratory and produced the keys to the car trunk. In the trunk the men from the crime laboratory saw a blue wallet, a compact, a multi-colored cosmetic case and a brown scarf, all of which belonged to the deceased. Defendant stated that the items belonged to his wife. When the wallet was opened it was seen to contain the driver's license of Jean Marie. Defendant was then advised of his Fifth and Sixth Amendment rights and was placed under arrest.

At the sheriff's office in Orange County, defendant explained the presence of the deceased's effects in the trunk of his car by stating: ". . . that when he and the girl left the bar they had actually gotten to the point where he had placed her suitcase in the trunk of his automobile and then she decided to go with these two other individuals and that actually there had been a disagreement and a scuffle and shoving and pushing and hitting between he and these two individuals, and they reached over and jerked her suitcase out of the trunk of his car, and when that happened some of the jewelry and personal items fell out on the ground, and

this might have been when her purse or wallet was caused to remain in the trunk of his automobile.''

On another occasion he said the articles in the trunk must have fallen out of the suitcase at a time when the suitcase in the trunk was opened in order to get from the suitcase a bottle of liquor that Jean Marie had there.

A later conversation of defendant with deputies at the Santa Ana sheriff's office was recorded on tape. After the deputies again gave the *Miranda* [384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)] warning, defendant indicated he understood it and proceeded to recount the events that transpired after he and the victim left the bar. His account was as follows:

The victim asked him to pull off the highway and directed him to the dirt road. After talking in the car for almost 10 minutes, the victim got out of the car and started to take down her girdle. She lost her balance and fell backward down the embankment of the ravine; defendant followed her down there, finished taking her clothing off and had intercourse with her. As they started back up the hill, the victim began complaining about her health and defendant hit her with his fist, cutting her eye. '' [I]t was just like an instinct, you know, something. I don't know what it was.'' He then picked up a two by four, hit her in the head until he saw a ''bunch of blood'' come up, threw some of her belongings in the trunk and returned to Oceanside, where he had two beers before going home.

Later that afternoon defendant was taken to the scene of the crime. He repeated his story and when asked why he struck the victim he said, ''She really didn't want to live.''

While in the Orange County jail, in the presence of some six men, defendant, on June 27, said he had ''caved her head in to where it was three inches wide,'' and that he did it because ''she didn't want to put out''; in answer to the question, ''Did you screw her?'' defendant replied ''I screwed the Hell out of her.'' In the same conversation, defendant told his auditors: ''He had had a few psychiatrists talking to him and ask him questions, and every time another psychiatrist would talk to him he would tell them a different story, and the reason for this was asked and the reason was so they would think he was nuts and they would send him to the farm for a couple of years and he would walk, he would just walk out after a couple of years.''

Larry F. Blodgett, the witness who testified to that conversation, was in jail for violation of probation and was not working for the police.

The only injury shown by defendant's military record was one suffered on October 1, 1965, when he was wounded in Viet Nam by grenade fragments in the right arm.

Otherwise, the military record was that of a generally average marine, with no outstanding and no degrading marks; defendant held the rating of lance corporal at the time of the killing, a position which involved a certain amount of responsibility.

## THE PSYCHIATRIC TESTIMONY

Two psychiatrists, Dr. Anderson and Dr. Wilson, as defense witnesses, gave opinion on the questions of defendant's sanity at the time of the killing and his ability to premeditate and form an intent.

Two psychiatrists, Dr. Hunter and Dr. Castile, testified on behalf of the prosecution.

## DR. ANDERSON

Dr. Anderson interviewed defendant on two occasions, interviewed his wife and parents, reviewed a psychiatric report (presumably that furnished the court prior to the hearing under section 1368, Penal Code), heard the recording of defendant's statement made at the sheriff's office, and examined his military record.

The doctor's opinion in large part was based upon statements made to him by defendant, the truth of which he accepted; among them were the statement that Jean Marie was not only a willing, but an eager participant in sexual intercourse; that the victim had been complaining about her health before she and defendant engaged in sexual intercourse and continued to complain afterwards; that the woman "just really had no desire to live" and that that was one of the reasons he had struck her; that after he had struck Jean Marie the first time with the weapon she seemed to him to be a member of the Viet Cong; that in January 1967 in Viet Nam he had suffered a head injury with possible brain damage (a statement unsupported by defendant's medical file).

Dr. Anderson was, however, ignorant as to some of the matters put into evidence, such as extensive damage done to Jean Marie's face and skull, the appropriation of her wallet and other personal articles by defendant, defendant's statement that they belonged to his wife, the conflicts between

different accounts given by defendant, and the physical evidence observed at the scene of the killing.

In his opinion, defendant did not have the mental capacity to deliberate the perpetration of the crime of murder at the time of the killing; he felt defendant had a mental condition that prevented premeditation and deliberation from being present; that at the time of the crime, defendant was suffering a schizophrenic reaction, catatonic type; that he did not know the quality of and did not know the differentiation between the rightness and wrongness of his act; that defendant's actions were not affected by alcohol; that the failure of sexual intercourse with defendant to put an end to the victim's complaints of ill health brought about a blow from defendant's fist; that until striking that blow defendant had been legally sane; that that blow brought about a catatonic attack in which the defendant struck the victim with the lethal weapon.

The doctor's diagnosis of schizophrenia assumed a confusion by defendant as to his own identity and as to the identities of others; when informed during cross-examination of defendant's statement that the articles of the victim found in the trunk of his car belonged to his wife, the doctor saw in that a confusion by defendant of the identity of the victim with that of his wife.

On cross-examination, he gave his opinion that defendant, at the time he had sexual intercourse with the victim, did not lack the ability to intend to accomplish that end even against the will of the woman. Other matters testified to by him on cross-examination follow:

"Q. Let's assume there was forcible sexual intercourse and the woman, in manifesting her outrage, was screaming and hollering at him, and let's assume further that may be she attempted to strike him.

"A. I would say that under that circumstance, since it is a provocation, a real overt gross provocation, I would say, no, that most likely he would understand the nature and quality of his act at that point, but then what we have to consider is the severity of the physical blows or the physical encounter that would happen after that.

" . . . . . . . . . . . . .

"Q. And then, in summing up, it would also be your opinion that he would be legally sane if his assault upon her was a response to Mr. Beach being abused, both physically and verbally, by the female?

"A. I would say most likely.

". . . . . . . . . . . . . . .

"Q. Now, as part of your examination of him did you form the opinion that he felt a tremendous guilt about not wanting his wife to know about this affair he had with this woman in the gully?

"A. Definitely so."

Had the intercourse been had against the will of the woman, the doctor's opinions as to defendant's sanity and ability to deliberate would have been different.

Concerning the victim's assumed lack of desire to live as a motive for the homicidal attack, the doctor was asked and answered on cross-examination:

"Q. Assuming those statements to be true, that implies a deliberate intent on his part to kill for the reason that she wanted to die, doesn't it?

"A. That is part of the answer."

### DR. WILSON

Dr. Wilson examined defendant on June 13; to him defendant denied any clear memory of any of the events involved and showed no evidence of remorse.

He concluded, on the basis of the information he had received from defendant, that defendant was not sane on the date of the examination. He had not formed an opinion as to defendant's capacity on March 31, but did feel considerable doubt as to defendant's sanity at the time of the offense; felt that the evidence established that defendant had a severe character disorder, mental disorganization, amnesia or confusion. He was unable to say whether this was strictly psychological or brought about as a result of an organic brain problem. He was also unable to say whether defendant knew the nature and quality of his act in killing the victim; realized that defendant's statements were unreliable; concluded that he did not have enough data upon which to base a firm opinion either as to defendant's sanity at the time of the killing or as to defendant's capacity at that time to premeditate and deliberate.

In the field of hypothesis, he gave the opinion that if defendant had raped the victim he could thereafter have killed her with a realization of the nature and quality of his act and with deliberate intent.

### DR. HUNTER

Dr. Hunter examined defendant on July 6. During the

interview, defendant told Dr. Hunter that he was not insane and that he did not want an insanity plea entered in his behalf; said he had amnesia and was unable to recall the entire episode of the killing; made a statement as to what had happened at the time of the killing, for which he said he was relying upon information he had received from police officers; made no mention of his thinking that his victim was Viet Cong.

The doctor based his opinion upon the sheriff's reports available to him and the interview he had with defendant. His opinion was that defendant was legally sane at the time he inflicted the injuries upon the deceased, understood the nature and consequences of his act, and was able to distinguish between right and wrong; he observed no evidence of remorse on the part of defendant and stated that defendant's personality pattern was that of a sociopathic personality which was manifested through defendant's inability to place the proper value on things and the inability to profit by past experiences; defendant's amnesia was malingering; there was no evidence or indication of a schizophrenic reaction in defendant; unless defendant was suffering from acute schizophrenic reaction which resulted in delusional thinking, the doctor could not accept the statement attributed to defendant that he killed the deceased because she was complaining of her health and did not want to live; defendant's victim was a threat to him, particularly so if the incident resulted from a forcible rape.

Reviewing the information in which defendant had said to other persons that he thought his victim was Viet Cong and that he was confused, Dr. Hunter said defendant was attempting to convince everyone that he was crazy, but that he was not crazy.

### Dr. Castile

Dr. Castile interviewed defendant on June 21; was told by defendant that he did not commit the offense because he would not do that type of thing to women.

Dr. Castile concluded that on June 21 defendant was incapable of assisting his counsel in his defense because he was quite frightened at the time and was going through a phase where he realized his then present situation and the possible consequences and was not really too rational on how he was going to defend himself; that the claim of amnesia about events as far back as February appeared to the doctor

to be "practically medically impossible," since defendant was able to recall very minor events effectively over that period; that in light of defendant's ability to fit himself into military life, defendant was a person with a definite sociopathic behavior problem because persons with a sociopathic behavior problem have uncontrollable patterns of acting for immediate gratification; that from his limited interview, the doctor found no serious defect in defendant's personality and no evidence of a schizophrenic tendency in defendant. The doctor was of opinion that defendant was legally sane at the time he committed the act on March 31.

### Contentions on Appeal

The basis of the appeal is the claimed insufficiency of the evidence to support a conviction of murder in the first degree because:

1. There is insufficient evidence of premeditation and deliberation, and defendant was incapable of such premeditation.

2. A conviction of murder committed in the perpetration of another felony may not be sustained because:

(a) There was no charge of rape contained in the information.

(b) Defendant was incapable of having formed an intention to commit rape.

(c) There was no evidence from which commission of rape might be inferred.

### Discussion of Psychiatric Evidence

Defendant did not testify either at the hearing under section 1368, Penal Code, or at the trial in chief. The trial judge, therefore, did not have the opportunity of observing the manner of defendant's testifying, or of hearing the result of cross-examination of defendant on the matter crucial to Dr. Anderson's opinion as to defendant's legal insanity, that is, whether the victim voluntarily engaged in sexual intercourse with defendant.

From the fact that defendant did not testify, neither the trial court nor this court is permitted to draw any inference in support of a finding of guilt or of sanity. Yet evidence is lacking as to the objective truth of many of the matters on which the expert opinion of Dr. Anderson was based, which assumed the existence of such matters.

The rule stated in *Kastner* v. *Los Angeles Metropolitan Transit Authority,* 63 Cal.2d 52, 58 [45 Cal.Rptr. 129, 403 P.2d 385], that opinion evidence based on hearsay is inadmissible, had no application when the person whose hearsay statements formed the basis of the opinion testified as a witness to the same effect; and had an additional exception with regard to the opinion of a medical expert.

Section 801, subdivision (b), Evidence Code, now specifically declares that an expert opinion may be based upon hearsay.

■ However, the value of an expert's opinion is dependent upon the truth of the assumed facts. (*Owings* v. *Industrial Acc. Com.,* 31 Cal.2d 689, 692 [192 P.2d 1].)

It is fair to say that expert opinion, placed on an assumption of fact of which there is no direct evidence, and as to the probability of the truth of which circumstantial evidence has created a strong counterweight, is of little value.

■ The weight to be accorded Dr. Anderson's opinion depended upon whether the physical evidence at the scene, taken together with defendant's admissions and inconsistent statements, afforded a reasonable inference that the act or acts of sexual intercourse had been against the will of the deceased, in spite of defendant's ex parte and self-serving statements to the contrary.

If such an inference might reasonably be drawn, and we hold that it might, the drawing of that inference reduced to insignificance Dr. Anderson's opinion of insanity and of inability to deliberate and premeditate.

It is noteworthy that in all the following cases, most of which are cited by defendant, in which a judgment of conviction of first degree murder was either reversed on appeal or reduced in degree, there was testimony by defendant upon the basis of which either the court or an expert witness might form an opinion as to a defendant's mental capacity: *People* v. *Kelley,* 208 Cal. 387 [281 P. 609]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Craig,* 49 Cal.2d 313 [316 P.2d 947]; *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Goedecke,* 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777].

While in *People* v. *Wolff,* 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], the only other case cited by defendant in that category, the defendant did not testify, there was no conflict

in the evidence as to the happenings, the occurrence of which was assumed by the psychiatrists who testified.

The trial court's finding that defendant was legally sane when the homicidal attack was made, and had the capacity to intend the death with deliberation and premeditation has substantial evidence to support it, and little other than the brutality and abnormality of the crime itself to support a contrary finding.

## SUFFICIENCY OF THE EVIDENCE AS TO MURDER DONE IN PERPETRATION OF A RAPE

■ It is not necessary to analyze the separate elements of the objective physical evidence that has been detailed elsewhere herein. Such an analysis may be found in the oral opinion of the trial court. We find it sufficient to support an inference that the lethal blows were struck in the perpetration of the crime of rape.

In *People* v. *Craig, supra*, 49 Cal.2d 313, cited by defendant for its alleged factual resemblance to the case at bench, the court on appeal not only found no evidence that rape had been done, but also found none that there had been sexual intercourse between defendant and the victim.

In arguing that there is no evidence sufficient to support an inference that defendant accomplished an act of sexual intercourse against Jean Marie's will, defendant makes her out to have been a woman of loose morals and states, concerning the victim: "The fact that she engaged in intimate sexual discussions in a bar with a stranger casts a darker shadow over her moral character."

The reference is to certain testimony of the witness Sylvia Bathe, which, when objected to by defendant, the court ordered stricken.

Since defendant has now relied upon that conversation, it may be observed that the victim's part in it, if it be accepted at face value, did not indicate her to be a promiscuous woman.[1]

---

[1]The conversation was this:
"Well, the subject just came around to male and female sex angle, and I made the statement that any woman with the right man at the right time would go to bed with him the first night, first time that they were together . . .

"She said, 'I beg to disagree with you.'

"She said, 'I wouldn't,' and he said, 'Why?' and she said, 'I would have to know a man. I would have to get to like him an awful lot,' she says . . ."

## Sufficiency of the Evidence of Premeditation

▮ Apart from the sufficiency of the evidence to support a finding that the killing was committed in the perpetration of rape, there is also sufficient evidence upon which to find that the killing was done with deliberation and premeditation.

An inference might reasonably be drawn that the blows were struck for the purpose of ridding the defendant of a possible threat to his domestic security or military standing because of the sexual relationship, whether voluntary or involuntary on the part of the woman.

## Sufficiency of the Accusatory Pleading

▮ Defendant contends that the conviction, based upon an implied finding that the fatal blows were struck in the accomplishment of an act of rape, is a denial of due process when the defendant has not been apprised by the information or otherwise that the prosecution will rely upon a felony-murder theory.

In *People* v. *Witt*, 170 Cal. 104, 107 [148 P. 928], the claim was made that the information did not allege that the murder was committed in the perpetration or attempt to perpetrate one of the felonies specified in section 189 of the Penal Code. The objection based upon that ground was rejected. (See also *People* v. *Jordan,* 45 Cal.2d 697, 709 [290 P.2d 484]; *People* v. *Terry,* 57 Cal.2d 538, 555 [21 Cal.Rptr. 185, 370 P.2d 985].)

In the case at bench, trial counsel did not express surprise at the prosecutor's opening argument advancing not only the theory of rape, but also of robbery and mayhem. Defense counsel then raised no question and made no motion for a new trial after the trial judge orally announced his belief that rape had been committed by the defendant.

The trial was conducted with every respect paid to the rights of the defendant.

Judgment affirmed.

Brown (Gerald), P. J., and Nix, J. pro tem.,* concurred.

A petition for a rehearing was denied July 8, 1968, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1968.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.