**Dumitru POP, Petitioner,**

v.

**Michael YARBOROUGH,
Warden, Respondent.**

**No. CV 03–6487–AHM(PJW).**

United States District Court,
C.D. California.

Jan. 18, 2005.

Ralph Herman Goldsen, Ralph H. Goldsen Law Offices, Goleta, CA, for Plaintiff.

Marc Aaron Kohm, Office of Attorney General of California, Los Angeles, CA, for Defendant.

## ORDER ACCEPTING REPORT AND ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

MATZ, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, the records on file, and the Report and Recommendation of United States Magistrate Judge. No objections to the Report and Recommendation have been filed. The Court accepts the Magistrate Judge's Report and adopts it as its own findings and conclusions.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

WALSH, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the Petition be denied and the action be dismissed with prejudice.

## I.

### SUMMARY OF PROCEEDINGS

A. *State Court Proceedings*

In 1988, Petitioner was indicted for the murder of his ex-wife and her new husband. (Answer to Petition for Writ of Habeas Corpus ("Answer"), Exh. B at 148.) In 1990, he was deemed not competent to stand trial and was committed to a state mental hospital. (Clerk's Transcript ("CT") 366, 369, 371.) In 1997, the trial court found that Petitioner had regained competence and ordered him to stand trial. (CT 432, Augmented Reporter's Transcript ("Aug.RT") E1–E2.) Petitioner waived jury and entered a plea of not guilty by reason of insanity. (CT 433, 505.) Thereafter, the trial court conducted a bench trial on the guilt phase and found Petitioner guilty of two counts of murder, residential burglary, and grand theft auto. (Reporter's Transcript ("RT") 141, RT 213.) The court also found that Petitioner committed the murders while engaged in the commission of a burglary, that Petitioner committed multiple murders, and that Petitioner used a firearm during the burglary and murders. (*See* CT 505, 513–14; RT 22–25.)

Following the guilt phase, the court conducted the sanity phase of the trial. (RT 214.) After hearing the evidence, the court concluded that Petitioner was sane at the time he committed these crimes. (RT 315–316.) The court sentenced Petitioner to life in prison without the possibility of parole. (CT 519–29.)

Petitioner appealed. (Answer, Exh. A,) The California Court of Appeal affirmed Petitioner's conviction and sentence in all respects. (Answer, Exh. B.) Petitioner filed a petition for review, which was denied by the California Supreme Court. (Answer, Exhs. C and D.) Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court, which was denied without comment or citation to authority. (Answer, Exhs. E and F.)

B. *Federal Court Proceedings*

On September 11, 2003, with the assistance of counsel, Petitioner timely filed the instant Petition pursuant to 28 U.S.C. § 2254 raising the following claims:

1. The trial court's finding that Petitioner was sane at the time of the murders was based on insufficient evidence and, therefore, denied Petitioner due process of law.
2. Appellate counsel rendered ineffective assistance of counsel by failing to argue that insufficient evidence supported the trial court's finding that Petitioner was sane at the time of the murders.

(Petition at 5–7.)

## II.

## STATEMENT OF FACTS [1]

In 1988, Violeta and Canstantin Cirdei were live-in employees in the Burbank home of the Pratts, an elderly couple in need of round-the-clock assistance. Petitioner was Violeta's ex-husband and the father of their 18–month old daughter, Adeline, who lived with Violeta and Canstantin.

Late at night on June 16, 1988, or early the following morning, Petitioner parked his car several blocks away from the Pratt home and entered the Cirdei's bedroom undetected. Violeta and Canstantin lay sleeping in their bed, and Adeline lay asleep in her crib. Petitioner fired six shots at Canstantin and either smothered or strangled Violeta. Petitioner then wrapped their bodies in the bloodstained sheets, tied plastic bags over their heads, knotted the bags at the neck, and placed both bodies in the trunk of Violeta's car.

Adeline was not harmed in the attack, but Petitioner wiped blood from his hands on her pajamas. Petitioner then flipped the bloodstained mattress on the bed, replaced the comforter, and covered the bloodstains on the floor with throw rugs.

Petitioner drove towards Mexico in Violeta's car, leaving Adeline at the Pratt home. On the way, he stopped in a mountainous area of San Diego County and buried the Cirdeis' almost-nude bodies in a sexually-suggestive position in a single grave.

Burbank police first learned that the Cirdeis had met with foul play when Adeline was found wandering the neighborhood in her bloody pajamas on the morning of June 17, 1988. The Pratts, who were both hearing-impaired and asleep in another area of the house at the time of the slayings, had not heard the gunshots

---

1. The facts were adopted from the California Court of Appeal's unpublished decision (*see* Answer, Exh. B), and supplemented by the trial and appellate record. (*See* CT Vols. 1–2; Aug. CT; RT Vols. 1–2; Aug. RT; Supplemental Reporter's Transcript ("Supp.RT").) Pursuant to 28 U.S.C. § 2254(e)(1), the California Court of Appeal's factual findings are presumed correct unless rebutted by clear and convincing evidence.

and could shed no light on the Cirdeis' disappearance.

The next day, police in Tijuana, Mexico observed Petitioner driving erratically in Violeta's car and stopped him. When Petitioner was unable to produce the vehicle's registration, officers noticed that the car had been hotwired. Petitioner was arrested and transported to the police station. After discovering bloodstained sheets in the trunk of the car, Tijuana police contacted San Diego police, who in turn contacted Burbank police.

Detective Krafft and Sergeant Kight of the Burbank Police Department went to Tijuana later that day and interviewed Petitioner. Petitioner waived his rights and answered the officers' questions. Subsequently, they took Petitioner into custody and drove him to the Burbank Police Department. Petitioner was questioned again during the drive and upon his arrival in Burbank.

When Sergeant Kight asked Petitioner what he had done with the Cirdeis' bodies, Petitioner asked Kight to shoot him. (RT 159.) The next day, Petitioner initiated a conversation with Kight in which he explained that his wife had obtained a restraining order against him because of a domestic violence incident, and that he "could not live with" having a judge tell him when he could visit his own child. (RT 162–65.) When Kight again asked Petitioner where the bodies were buried, Petitioner directed officers to the Cirdeis' grave site. (RT 165–74, 198.)

### III.

### STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

■■■ "Under the 'contrary to' clause, a federal habeas court may grant the writ [only] if the state court arrive[d] at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decide[d] a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case. *Id.* at 413, 120 S.Ct. 1495. To merit relief under this clause, the state court decision must be objectively unreasonable, not just incorrect or erroneous. *Id.* at 409–10, 412, 120 S.Ct. 1495.

■■■ Both of the grounds raised in the instant Petition were raised before the California Supreme Court, which did not issue a written opinion. Where, as here, there is no reasoned state court decision, this Court conducts an independent review of the record. *See Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000).

## IV.

## DISCUSSION

**A. Sufficient Evidence Supported The Trial Court's Finding That Petitioner Was Sane When He Murdered The Cirdeis [2]**

Petitioner argues that the trial court's determination that he did not introduce sufficient evidence to establish he was insane at the time of the murders was an unreasonable finding of fact under 28 U.S.C. § 2254(d)(2). (See Petition at 7.) The Court finds this claim is without merit.[3]

 Under California law, "[t]he party claiming that [he] ... 'is' or was insane has the burden of proof on that issue."[4] See Cal. Evid.Code § 522. Within this framework, insanity operates as an affirmative defense to a criminal charge. See People v. Hernandez, 22 Cal.4th 512, 522, 93 Cal.Rptr.2d 509, 994 P.2d 354 (2000). At the sanity phase of a trial, there is a rebuttable presumption the defendant was sane when the crime was committed, and it is his burden to prove otherwise by a preponderance of the evidence. See In re Dennis, 51 Cal.2d 666, 673, 335 P.2d 657 (1959). Thus, although an insanity defense may be relevant to the element of mens rea,[5] "sanity is not an element of the crime" under California law, even when the defendant pleads not guilty by reason of insanity. See Hernandez, 22 Cal.4th at 522, 93 Cal.Rptr.2d 509, 994 P.2d 354 (noting that the affirmative defense of insanity is separate and independent from the elements of any underlying crime); see also People v. Wagoner, 89 Cal.App.3d 605, 613, 152 Cal.Rptr. 639 (1979) (citation omitted).

The United States Supreme Court never has recognized a federal constitutional right to present a sanity defense. See Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Although the Court has held that the transfer of an inmate from a prison to a mental hospital implicates liberty interests, see Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), it has never held that the reverse is true: that transfer of an inmate from a mental hospital to a prison triggers constitutional protections.

One United States Supreme Court case has approved federal habeas corpus review of a petitioner's claim that he "had been denied due process of law because he had been convicted upon evidence allegedly insufficient to prove beyond a reasonable

---

**2.** Because Petitioner does not dispute that the prosecution met its burden of proving that he committed the charged crimes (see Petition at 7), the Court will not review the sufficiency of the evidence supporting the trial court's guilt determinations.

**3.** The Court notes that this case contains the unusual twist of Petitioner arguing that this claim was procedurally defaulted because his appellate counsel failed to raise it on appeal, and Respondent arguing that the claim is not defaulted because Petitioner raised it in his state supreme court habeas petition. Suffice it to say that the Court elects to ignore the procedural default issue and reach the merits of Petitioner's claim.

**4.** The United States Supreme Court has upheld the constitutionality of similar statutory schemes that saddle the defendant with the burden of proving his own insanity. See Leland v. Oregon, 343 U.S. 790, 792, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (rejecting a due process challenge to an Oregon statute that required a criminal defendant to prove the defense of insanity beyond a reasonable doubt).

**5.** As then-Justice Rehnquist has observed, "[a]lthough ... evidence relevant to insanity as defined by state law may also be relevant to whether the required mens rea was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." Mullaney v. Wilbur, 421 U.S. 684, 705–06, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (concurring opinion).

doubt that he was sane at the time the victim was killed." *Moore v. Duckworth,* 443 U.S. 713, 713–14, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979). In *Moore,* however, the applicable state law required the prosecution to prove the defendant's sanity beyond a reasonable doubt. *See id.* Under *Moore,* challenges to evidence material to an element of an offense raise constitutional due process concerns cognizable on habeas.

As a starting point, then, it does not appear that Petitioner's claim relating to his insanity defense is even cognizable under habeas because sanity was not an element of the offenses for which he was convicted. *See Gall v. Parker,* 231 F.3d 265, 307 (6th Cir.2000)(finding claim that evidence was insufficient to establish sanity was not cognizable under § 2254 where sanity is not an element of crime), *overruled on other grounds by Bowling v. Parker,* 344 F.3d 487, 501 n. 3 (6th Cir.2003); *see also Battie v. Estelle,* 655 F.2d 692, 702 n. 23 (5th Cir.1981)(denying habeas relief for challenge to sufficiency of evidence of sanity because there is no federal constitutional right to present the defense of insanity). Analogously, and by way of contrast, when *mens rea* is an element of the offense, federal habeas review of the sufficiency of the evidence of the petitioner's state of mind *is* available. *See, e.g., Ellis v. Armenakis,* 222 F.3d 627, 631 (9th Cir. 2000) (entertaining habeas review of sufficiency of the evidence of Petitioner's state of mind).

■ Petitioner's sufficiency claim then is really a challenge based on state law. But a state prisoner is entitled to federal habeas relief *only* if he is held "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a). A challenge to a conviction must therefore do more than pose a question of state law, for such a challenge alleges no deprivation of federal rights and

does not merit habeas relief. *See Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Petitioner argues that, in fact, there is authority for the proposition that the issue of sanity is reviewable in habeas. He cites *Valdez v. Ward,* 219 F.3d 1222, 1236 (10th Cir.2000) (engaging in habeas review where, under Oklahoma law, the ultimate burden on the issue of sanity rested with the prosecution), and *Greider v. Duckworth,* 701 F.2d 1228, 1233 (7th Cir. 1983)(same, under Indiana law), in support of this proposition. But California law is different. It places the burden of proof on the defendant, not the state. *In re Dennis,* 51 Cal.2d at 673, 335 P.2d 657. Thus *Valdez* and *Greider* do not support his argument.

■ Assuming *arguendo* that Petitioner's challenge to the sufficiency of the evidence of his sanity is cognizable under § 2254(a), the Court finds that there was sufficient evidence to support the trial court's conclusion that Petitioner was sane. Under California law, the finder of fact—in this case, the trial judge—is the sole arbiter of a defendant's sanity at the time of the charged crime. *See* Cal. Evid.Code § 312. For that reason, and because the burden was on Petitioner to show by a preponderance of the evidence that he was insane when he committed the murders, this Court cannot overturn the trial judge's conclusion to the contrary unless it finds as a matter of law that the trial judge could not reasonably reject the evidence of insanity. *See People v. Skinner,* 185 Cal. App.3d 1050, 1059, 228 Cal.Rptr. 652 (1986); *see also People v. Dean,* 158 Cal. App.2d 572, 577, 322 P.2d 929 (1958)(hold-

ing that "[t]he finding of the trier of fact upon the issue of insanity cannot be disturbed on appeal if there is any substantial and credible evidence in the record to support such finding."). If neither party presented credible evidence on that issue, then the trial court was required to find Petitioner sane. *See People v. Drew,* 22 Cal.3d 333, 351, 149 Cal.Rptr. 275, 583 P.2d 1318 (1978), *superseded by statute on other grounds as stated in People v. Wilder,* 33 Cal.App.4th 90, 99, 39 Cal.Rptr.2d 247 (1995). Even in cases where there is "substantial conflict in the evidence," the fact-finder's determination that a defendant was sane at the time of his crimes will not be disturbed, if supported by substantial evidence. *See People v. Reid,* 193 Cal. 491, 498, 225 P. 859 (1924).

At the sanity phase of Petitioner's trial, the trial court examined documentary evidence from several doctors who offered opinions about Petitioner's sanity at various points in time. (*See* Aug. CT.; *see also* RT 283.) From 1990—the year that Petitioner was found incompetent to stand trial—Dr. J. Arturo Silva cited the possibility that Petitioner was malingering. (*See* Aug. CT 8–13.) By 1994, Dr. Kaushal Sharma noted that, although Petitioner claimed to be hallucinating, he was evasive about his hallucinations and unwilling to cooperate with the hospital staff's competency evaluations. (Aug. CT 22–23.) The following year, Drs. Nora Paculdo and Michael Maloney joined Dr. Sharma in noting that Petitioner was evasive about his hallucinations, and noted strong evidence of malingering. (Aug. CT 29–36, 38–42.) During this entire period, only one doctor—Dr. Vianne Castellano—found that Petitioner was not competent to stand trial and that he was not malingering. (Aug. CT 3–7, 24–28, 45–48.)

In an attempt to develop an opinion as to Petitioner's sanity at the time of the crimes, Dr. Maloney again evaluated Petitioner prior to trial. During his interview, Dr. Maloney was unable to evaluate Petitioner's sanity at the time of the crimes because Petitioner denied having any memory of what had happened. Dr. Maloney so noted, and concluded that Petitioner's claimed lack of memory of the crimes seemed false. (Aug. CT 56–58.)

Dr. Castellano's testimony formed the centerpiece of Petitioner's sanity phase defense. (RT 255–78.) Dr. Castellano also evaluated Petitioner's sanity at the time of the murders. Although Petitioner disavowed remembering the murders, Dr. Castellano opined that Petitioner was insane at the time of the crimes, and that he believed God directed him to kill Canstantin Cirdei. (RT 269; Aug. CT 64–74.) Dr. Castellano's opinion was based on hundreds of hours of interviews with Petitioner and his family—who had told her that Petitioner had a childhood history of serious head injuries and radical shock-treatments. (Aug. CT 66.)

The prosecution did not offer any expert testimony to rebut Dr. Castellano. Instead, it presented testimony from police officers and other percipient witnesses to show that Petitioner's behavior around the time of the murders showed planning, concealment, a memory of the crime, and a recognition of the consequences of his actions that was inconsistent with insanity. (RT 106–08, 147–48, 151–54, 159–69, 199–200.)

On the basis of all of the testimony and other evidence, the trial court determined that Petitioner had not met his burden of demonstrating that he was probably insane at the time of the crime. (RT 315–16.) After noting that the evidence showed that Petitioner had traumatic head injuries and psychological difficulties as a child, the court cautioned that "mental illness is not the same as legal insanity." (RT 312.) The court then reasoned:

If you look at the facts of the crimes, you see that [Petitioner] was able to, undetected, come into the house in the middle of the night, murder two people, one by shooting, one by suffocation, strangulation. [¶] [Petitioner] was able to remove these bodies from the home and drive—drove toward Mexico, and on the way, buried the bodies. [¶] When [Petitioner] was detained by the Mexican police, he was able to make up a lie about the car. He also made up [sic] a feeble attempt, I thought—tried to bribe his way free. [¶] While [Petitioner] told Dr. Castellano that God commanded him to kill the victims, he never mentioned these commands to anyone except Dr. Castellano, and that was some years later. [¶] . . . . [Petitioner] did tell Sergeant Kight that he was upset with his ex-wife, she treated him badly, she had a restraining order against him, and the limited visitation with his daughter. [¶] While the doctor [Castellano] talks about a fugue state, the [Petitioner] could not remember committing the murders. What cannot be explained to the court's satisfaction is how he could remember in such great detail where he drove and where he buried the bodies and how he placed the bodies. [¶] It would seem if [Petitioner] had amnesia about the crime, he could not remember in detail the—his escape and where he buried the bodies. [¶] . . . . So when you look at the specific details of the crimes and the actions before and after, the court finds that [Petitioner] did know and understand the nature and quality of his actions when he murdered these people. [¶] The issue is whether [Petitioner] distinguished right or wrong. If good was good and the right thing to do [was] to kill these people, then why was he so secretive about it? [¶] Why did [Petitioner] enter the house in the middle of the night undetected? Why did he attempt to cover up his crime? Why did he hide the bodies so he [sic] would not be found? And why did he flee to Mexico?

(RT 313–15.)

The California Court of Appeal agreed with this assessment, noting that the evidence Petitioner presented "fell short of showing that he was incapable of understanding the nature and quality of his acts or distinguishing right from wrong when he murdered the victims," and found that the evidence presented by the prosecution betrayed Petitioner's "understanding of the wrongfulness of his crime." (Answer, Exh. B at 161.)

After an independent review of the record, this Court agrees with the California courts' assessment of the evidence. The trial court's finding of sanity must stand unless the fact finder could not, as a matter of law, reasonably reject the evidence of insanity. *See Skinner*, 185 Cal.App.3d at 1059, 228 Cal.Rptr. 652.

Here, Petitioner's strongest evidence of his insanity was the testimony of Dr. Castellano. The trial court rejected this evidence, noting Petitioner's expert was an "advocate." (RT 135.) The record confirms that Dr. Castellano was an advocate, to the point of disregarding factual assertions about Petitioner's conduct that contradicted her theory that he committed the murders in a disassociative fugue. (*See* RT 84–89.) Dr. Castellano's apparent partisanship was a valid reason to discount her testimony. Under California law, any uncontradicted witness, lay or expert, may be disregarded to the extent that the finder of fact decides that the witness is biased or otherwise not credible. *See* Cal. Evid. Code § 780; *see also People v. Kurbegovic*, 138 Cal.App.3d 731, 752–53, 188 Cal.Rptr. 268 (1982) (noting that the finder of fact could discount a mental health expert's testimony when he crossed the line and became an advocate for the defendant's

incompetency). Federal law is consistent on this point.[6]

Additionally, as the trial court noted, Dr. Castellano's lack of familiarity with the facts of the case led her to talk "about facts that didn't exist." · (RT 135.) Indeed, the record reflects that Dr. Castellano's understanding of many of the details of the events before, during, and after Petitioner's crime was incorrect. (See RT 84–86, 270, 271–72, 274–75.) Additionally, Dr. Castellano's opinions about what Petitioner was capable of saying or doing were so contradictory to the evidence that even Dr. Castellano had to admit the possibility that Petitioner had duped her. (See RT 82–83, 86–89.) The trial court was entitled to discount uncorroborated expert testimony based on factual assumptions and conclusions that Dr. Castellano reached solely through her conversations with Petitioner, at least to the extent that her testimony contradicted other evidence in the record.

See People v. Beach, 263 Cal.App.2d 476, 487, 69 Cal.Rptr. 394 (1968) ("It is fair to say that expert opinion, placed on an assumption of fact of which there is no direct evidence, and as to the probability of the truth of which circumstantial evidence has created à strong counter-weight, is of little value.")

 Indeed, the chasm between Dr. Castellano's assumptions and the facts of the case provided a more compelling reason to reject her testimony than if the prosecution had offered contradictory expert testimony.[7] As one California court has observed:

> If [an] expert's opinion is contradicted by the opinion of another expert, it merely suggests the first expert may have reasoned incorrectly; it does not suggest his general untruthfulness as a witness. [¶] On the other hand, where the *facts* underlying the expert's opinion are proved to be false or nonexistent,

---

**6.** See also Dennis ex rel. Butko v. Budge, 378 F.3d 880, 905 (9th Cir.2004) (noting that a possible bias in an expert's appraisal of the defendant's psychological condition may be grounds for rejecting even uncontradicted expert testimony) (concurring opinion); see also United States v. Woodson, 526 F.2d 550, 551 (9th Cir.1975) (per curiam ) (confirming that finders of fact can disbelieve uncontested expert testimony and rely on other, conflicting evidence in the record).

**7.** Petitioner emphasizes that Dr. Castellano's testimony was the *only* expert testimony offered by either party on the subject of Petitioner's sanity at the time of the murders, and insists that the court's rejection of that testimony led it to "substitute its untrained judgment for the opinion of a psychiatric professional." (Petition at 7; see also Traverse at 10.) Petitioner's implicit reliance on the fact that this expert's testimony was uncontradicted by another expert is misplaced. An expert's testimony that a defendant was insane when he committed crimes can be rejected even when the prosecution presents *no* evidence during the sanity phase at trial. See Drew, 22 Cal.3d at 351, 149 Cal.Rptr. 275, 583 P.2d

1318. Indeed, the California Supreme Court frequently upholds verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion. See Skinner, 185 Cal.App.3d at 1059, 228 Cal.Rptr. 652 (citing cases). · As the California Supreme Court has emphasized:

> It is only in the rare case when the evidence is uncontradicted and entirely to the effect that the accused is insane that a unanimity of expert testimony could authorize upsetting a jury finding to the contrary. While the jury may not draw inferences inconsistent with incontestably established facts, nevertheless if there is substantial evidence from which the jury could infer that the defendant was legally sane at the time of the offense such a finding must be sustained in the face of any conflicting evidence, expert or otherwise, for the question of weighing that evidence and resolving that conflict is a question of fact for the jury's determination.

People v. Wolff, 61 Cal.2d 795, 804, 40 Cal. Rptr. 271, 394 P.2d 959 (1964) (emphasis added). As explained below, the remainder of the evidence was neither uncontradicted nor entirely to the effect that Petitioner was sane at the time he committed the murders.

not only is the expert's opinion destroyed but the falsity permeates his entire testimony; it tends to prove his untruthfulness as a witness.

*Kennemur v. State of California,* 133 Cal. App.3d 907, 923–924, 184 Cal.Rptr. 393 (1982) (emphasis in original).

To the extent Dr. Castellano's testimony had factual support, the trial court acted within its discretion when it concluded that her testimony proved only that Petitioner showed signs of nervousness or anxiety *after* the murders, as opposed to full-blown insanity *during* the murders. For example, it was noted by Dr. Castellano that Petitioner chewed the rim of a styrofoam cup and chewed the edge of a map on the return trip from Mexico. According to police, however, his behavior appeared to indicate nervousness, not insanity. This behavior was as consistent with anxiety about punishment *after the fact* as it was with any psychological crisis. (RT 109.) Also, Petitioner's begging "shoot me, shoot me" at various times on the return trip from Mexico was, in the context of his preoccupation with how he would be punished for his crimes, at least as suggestive of a consciousness of guilt *after the fact,* as it was of any mental instability at the time of the murders. (*See* RT 137, 165, 200; *see also* Answer, Exh. B at 161.) Because the test for insanity includes a temporal element—Petitioner must show that, *"when the act was committed,* [he] was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed," *see People v. Willard,* 150 Cal. 543, 554, 89 P. 124 (1907)

(italics added)—Petitioner's inability to connect these odd comments and behaviors to his state of mind during the crime was fatal to his insanity defense.[8]

Besides Petitioner's odd behavior, which he understandably emphasizes, the finder-of-fact also was entitled to consider factors that demonstrated the cunning of a sane person, including Petitioner's apparent ability to devise and execute a deliberate plan and the manner in which these crimes were conceived and executed. *See Wolff,* 61 Cal.2d at 805, 40 Cal.Rptr. 271, 394 P.2d 959. Each of those considerations supports the judge's finding of sanity here. For example, after killing the Cirdeis, Petitioner took measures to conceal his actions by flipping the bloody mattress and covering the bloodstained floors with throw rugs. (RT 149, 187.) These actions to conceal the crime suggest a knowledge of wrongdoing, and support an inference of sanity. *See People v. Steele,* 254 Cal. App.2d 758, 765, 62 Cal.Rptr. 452 (1967) (holding a murderer's concealment of acts he took in the course of killing his wife supported an inference of sanity). Petitioner's subsequent attempt to evade capture by fleeing to Mexico also supports the inference that he was sane. *See People v. James,* 208 Cal.App.3d 1155, 1165, 256 Cal. Rptr. 661 (1989) (noting that flight is a factor which may considered in determining the defendant's sanity); *see also People v. Huddleston,* 275 Cal.App.2d 859, 864, 80 Cal.Rptr. 496 (1969) (same). From this evidence the trial court could, without violating Petitioner's due process rights, draw the line between the guileless "crazy" of the truly insane and the calculated "crazy" of the truly criminal.[9]

8. Petitioner's complaint that the California courts' decisions "were based on inferences from [P]etitioner's behavior that were not inconsistent with insanity" tacitly misstates his burden of proof. (Traverse at 10.) As the California Supreme Court has stated: "Defendant [...] has the burden of proof on the issue of insanity; if neither party presents credible evidence on that issue the [finder of

fact] must find him sane." *Drew,* 22 Cal.3d at 351, 149 Cal.Rptr. 275, 583 P.2d 1318. Thus, Petitioner's characterization of his post-murder conduct as "not inconsistent with insanity" is beside the point.

9. Additionally, although the trial court did not emphasize it, the record contains significant other evidence to suggest that Petitioner's

At most, Petitioner's odd behaviors evinced some form of lingering mental illness. As the trial court noted, however, this was not enough to meet Petitioner's burden. (*See* RT 312.) Mere affliction with a mental illness is insufficient to establish insanity in California. *See People v. Kelly*, 1 Cal.4th 495, 549, 3 Cal.Rptr.2d 677, 822 P.2d 385 (1992) ("Mental illness is a medical diagnosis; it alone does not necessarily establish legal insanity."). The trial court needed to determine whether, *as a result* of his mental illness, defendant knew right from wrong or whether he appreciated the nature and consequences of his actions. *See People v. Skinner*, 39 Cal.3d 765, 768–769, 217 Cal.Rptr. 685, 704 P.2d 752 (1985). To the extent Dr. Castellano testified to Petitioner's childhood history of traumatic head injuries and his odd behavior as an adult, her testimony simply did not prove a causal relationship between any residual mental illness and Petitioner's act of killing the Cirdeis.

Assuming that this claim states a federal question cognizable in habeas, the Court concludes that the trial court's determination that Petitioner was sane when he committed the murders was neither an unreasonable interpretation of the facts nor contrary to federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to federal habeas corpus relief.

B. *Appellate Counsel's Failure To Cite The Eighth Amendment In His Challenge To The Sufficiency Of The Evidence Of Petitioner's Sanity Was Not Ineffective Assistance*

■ Petitioner's appellate counsel argued in the state courts that the trial court's finding that he was sane at the time of the murders was a violation of the Eighth Amendment to the United States Constitution. (Answer, Exh. A at 104–07.) In Ground One of this Petition, Petitioner contends that this was a mistake, and argues that the court's sanity finding should have been presented as a violation of the Due Process Clause of the Fourteenth Amendment. (Petition at 6.) According to Petitioner, this mistake amounted to ineffective assistance. (Petition at 6.) After reviewing the record, the Court concludes that Petitioner has not demonstrated that his appellate counsel's performance fell below constitutional standards.

Appellate counsel's performance is evaluated under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Miller v. Keeney*, 882 F.2d 1428, 1431 n. 4 (9th Cir.1989) ("While the right to the effective assistance of counsel at trial is guaranteed to state criminal defendants by the sixth amendment as applied to the states through the fourteenth, the sixth amendment does not address a defendant's rights on appeal; the right to effective state appellate counsel is derived purely from the

---

claimed lack of memory of the murders was indeed false. For example, when one officer who saw the blood-stained sheets in the car asked Petitioner, "Is there any doubt in your mind that I know that you killed Violeta and Canstantin?", Petitioner stated: "No." (RT 147.) Officers also testified that, when they told Petitioner that they had found Adeline wandering the Burbank neighborhood with bloody pajamas, Petitioner made a wiping motion with his cuffed hands—an act which the officer understood to mean that Petitioner

had wiped his hands on his daughter's bedclothes after the murders. (RT 147, 150.) And when Petitioner accompanied police to the site where he had buried the Cerdeis, he refused to look at the bodies but told officers that "he didn't want me to—he said he wasn't sick. He wasn't a homosexual, he wasn't queer, he wasn't mad, he wasn't crazy, but he had buried the bodies like he found them." (RT 169.) None of these statements is consistent with Petitioner's professed inability to remember committing the crimes.

fourteenth amendment's due process guarantee.").

To establish a claim of ineffective assistance of appellate counsel, a petitioner must show *both* that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Smith v. Robbins,* 528 U.S. 259, 285, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).[10] A claim of ineffective assistance must be rejected upon finding *either* that counsel's performance was reasonable or that the alleged error was not prejudicial. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

The reviewing court must examine the reasonableness of counsel's challenged conduct under all the circumstances, including the facts of the particular case as viewed at the time of the conduct. *Id.* at 688, 690, 104 S.Ct. 2052. Scrutiny of counsel's performance must be "highly deferential"; a petitioner must overcome the specific presumption that, under the circumstances, a challenged action might be considered sound strategy, as well as the general presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[11] *Id.* at 689–90. *Strickland* imposes on a petitioner a "highly demanding" standard requiring a demonstration that counsel's conduct constituted "gross incompetence." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see also Lord v. Wood,* 184 F.3d 1083, 1085 (9th Cir. 1999).

As he has pleaded it, Petitioner's *Strickland* claim is contingent on his sufficiency-of-the-evidence claim. As explained above, however, the sufficiency-of-the evidence claim does not appear to be cognizable in federal habeas and, even if it is, the record establishes that the trial court properly concluded that Petitioner was sane at the time of the murders. "A failure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon,* 281 F.3d 851, 872 (9th Cir.2002); *see also Wildman v. Johnson,* 261 F.3d 832, 840 (9th Cir.2001) (holding that appellate counsel could not be found to have rendered ineffective assistance for failing to raise issues that "are without merit"); *Boag v. Raines,* 769 F.2d 1341, 1344 (9th Cir.1985) (failing to raise meritless argument on appeal does not constitute ineffective assistance of counsel); *Gustave v. United States,* 627 F.2d 901, 906 (9th Cir.1980) ("There is no requirement that an attorney appeal issues that are clearly untenable.").

Nor can Petitioner show prejudice. *See Strickland,* 466 U.S. at 694–95, 104 S.Ct. 2052. To prove prejudice, it is not enough to show that counsel's errors had some conceivable effect on the outcome. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. A petitioner has the burden of showing a reasonable probability, *i.e.,* "a probability sufficient to undermine confidence in the outcome," that, but for counsel's errors, the result of the proceeding would have

---

**10.** Although the constitutional wellspring of the right to effective appellate counsel differs from that securing the right to effective trial counsel, the same *Strickland* standard applies to both claims. *See United States v. Birtle,* 792 F.2d 846, 847 (9th Cir.1986). The appropriate inquiry is not, therefore, whether raising a particular issue on appeal would have been frivolous, but whether there is a reason-

able probability that raising it would have led to reversal. *Miller,* 882 F.2d at 1434.

**11.** The reviewing court need not determine the actual reason for an attorney's challenged action, as long as the conduct falls within the range of reasonable representation. *Morris v. California,* 966 F.2d 448, 456–57 (9th Cir. 1991).

been different. *Id.* at 694–95, 104 S.Ct. 2052; *see also Lord,* 184 F.3d at 1085–86.

Here, Petitioner's only claim of prejudice is that, because appellate counsel did not specifically mention the Fourteenth Amendment in his state court briefing of the sufficiency-of-the-evidence issue, his neglect led to "a waiver and procedural default" of Ground Two. (Petition at 6.) As explained above, however, Petitioner raised his Fourteenth Amendment claim in his state habeas pleadings so there was no waiver or procedural default—at least, not in this Court. (*See* Answer, Exh. E at 242–50.) And because the substantive claim that Petitioner raises in Ground Two is, as explained above, meritless, Petitioner cannot show prejudice from his appellate counsel's failure to specifically argue it in state court. *See Jones v. Smith,* 231 F.3d 1227, 1239 n. 8 (9th Cir.2000) (finding no prejudice from appellate counsel's failure to raise an issue on direct appeal, where the issue itself would not have provided grounds for reversal).

The California Supreme Court rejected Petitioner's claim of ineffective assistance of appellate counsel without comment or citation to authority. (Answer, Exh. E at 240–42.) Petitioner has not demonstrated that any part of the state court's decision amounted to an "objectively unreasonable" application of federal law. *See Lockyer v. Andrade,* 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). For all of the reasons discussed above, Petitioner is not entitled to federal habeas relief.

## V.

### RECOMMENDATION

IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; (2) denying the Petition; and (3) directing that Judgment be entered dismissing this action with prejudice.