[No. A026869. First Dist., Div. Three. July 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND SKINNER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Certified for publication except as to part IV. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Judd C. Iversen and Linda Leavitt, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edward P. O'Brien, Assistant Attorney General, and Clifford K. Thompson, Jr., Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**BARRY-DEAL, J.**—The trial court, sitting without a jury, found appellant guilty of second degree murder of his wife and that he was sane at the time he committed the offense, after a hearing at which the guilt and sanity phases were consolidated by stipulation. The court sentenced appellant to the term prescribed by law, 15 years to life (plus a concurrent term of 1 year for use of a deadly weapon). Appellant claims that the trial court erred in rejecting evidence that he was insane and that his insanity was "settled."[1] We affirm the judgment.

---

[1]Appellant raises two other contentions which we dispose of in the unpublished portion of this opinion.

## I. *The Facts*

*The Oakcrest Hospital Commitment.* On July 19, 1983, at about 6 p.m., Rohnert Park Police Officer William Deas took appellant into custody pursuant to Welfare and Institutions Code section 5150 (authorizing a 72-hour hold of a person thought dangerous to self or others). Appellant appeared paranoid and thought many people were out to get or kill him. Deas transported appellant to Oakcrest Hospital, where appellant told him he had taken Quaaludes and free-based cocaine.

Admitting mental health aide Edward Atchison described appellant as appearing "very suspicious" but exhibiting a "jaunty quality" as if intoxicated. Appellant admitted, "I've been smoking some base." Psychiatric technician Keith Manich observed appellant sleeping during the night. At 10 a.m. the following morning, appellant was seen by a psychiatrist and "discharged to self," i.e., permitted to leave. The examiner found appellant calm, together, and without any sign of residual difficulty. Apparently, appellant told a technician that he is paranoid only when using drugs.

Appellant played pool in the hospital lobby for four or five hours following his discharge; he stated he was waiting for a ride. During this time, he appeared to technician Julie Marlborough to have been angered by a nurse's remark; the nurse, Stephanie Craig, did not recall speaking to him. Appellant was picked up by his wife of 29 years, Mary Anne Skinner, and they were seen embracing.

*The Town House Motel.* About 5 p.m. on July 20, 1983, appellant and his wife checked into room 105 of the Town House Motel in Santa Rosa. Manager Doyle McElyea, who had seen appellant on several prior occasions, noticed him tossing a Frisbee with a grandson. Appellant told police that after dinner he free-based cocaine all night with his wife, apparently until 5 a.m. on July 21.

At 11:24 a.m. on July 21, 1983, maid Shawn Hawthorne testified, a man knocked on the Skinners' door. Hawthorne heard a female voice respond, "We're still in here." Twenty minutes later, the maid saw appellant drive away from the motel alone.

*The Freeway.* At 12:05 p.m., California Highway Patrol Officer Arthur Jaggie, on routine patrol on United States Highway 101 near Petaluma, observed appellant drive his automobile through the center divider, stop the vehicle across two traffic lanes, get out, and walk between the lanes toward the oncoming traffic. Jaggie stopped all traffic and, assuming appellant had been dazed crossing the divider strip, approached him and attempted to

assist him in leaving the freeway. Arms raised, appellant said, "Kill me. I want to die." When Jaggie tried to lead him from the road, appellant exclaimed, "I killed my wife," and "I want you to kill me," and grabbed for the officer's service revolver. Jaggie struggled with appellant, subdued him, and, with the assistance of a passing motorist, handcuffed him. Walking to Jaggie's patrol cruiser, appellant said, "I killed my wife. I want you guys to kill me! I'll make you kill me!" Appellant then told Jaggie he slit his wife's throat in the Town House Motel in Santa Rosa. The officer radioed this information to his dispatcher, requesting a check of the motel.

Santa Rosa Police Officer Eugene Fahy was sent to the Town House Motel where, at 12:18 p.m., he found the warm but lifeless body of Mary Anne Skinner lying in a pool of blood in room 105. This discovery was radioed to Jaggie, who informed appellant he was under arrest for homicide.

Sonoma County Deputy Sheriff Spencer Martin arrived to assist Jaggie. He noted that appellant had a wild look in his eyes and appeared highly agitated. The officers decided to place appellant in the deputy's vehicle, which had a safety screen. As this was accomplished, appellant became violent and repeatedly attempted to kick the officers. Appellant growled like an animal. Smiling, he said, "You're going to have to kill me." En route to the police station, Martin heard appellant remark, "I killed her, isn't that funny?" "Now you'll have to kill me." At the station, appellant again resisted with extraordinary strength.

When appellant was brought into the police station, Officer Bruce Lieurance noted that his denim trousers did not appear bloodstained, but that his socks were stained, as was his shirttail; minor blood specks were visible on one tennis shoe and on a shirt sleeve. Appellant carried $672 in cash.[2]

At 1:30 p.m., Dr. Anthony Chapman, a pathologist, and Linton Von Beroldingen, a criminalist, arrived at room 105 of the Town House Motel. The criminalist found cocaine base, a cocaine pipe, cocaine free-base residue, marijuana, and a pair of bloodstained denim trousers. He also found the broken top or neck portion of a bottle and other pieces, bearing traces of type O human blood. He found type A human blood on the bathroom sink. Appellant's blood was type A; his wife's blood was type O. Evidence technician John Jaynes found I Ching books in the room.

Dr. Chapman performed a superficial examination of the body at the crime scene and later performed an autopsy. He attributed death to head injuries

---

[2]At trial, defense counsel conceded that "there's a lot of evidence" that, after killing his wife, appellant changed his trousers, put on his tennis shoes, got his wallet and money, and dumped out his wife's purse before leaving the motel room.

caused by a blunt instrument and to gaping lacerations on the left and right sides of Mrs. Skinner's neck. A blow to the back of her head resulted in skull fractures, brain tissue damage, and hemorrhaging. That blow and a forehead wound could have been inflicted with a wine bottle. The deep incisions on each side of the neck were about four inches long. Other minor lacerations and bruises were noted. The pathologist opined that the victim might have been struck on the forehead with a bottle, struck again on the back of the head, then slashed twice on the neck with the broken bottle.

Blood samples taken from appellant at 2:20 p.m. contained .03 milligrams per milliliter of cocaine. At the time, light bothered his eyes, which were somewhat unfocused.

*Appellant's Statement.* About 3:50 p.m. on July 21, 1983, Detectives Arthur Toscano and James Shrum interviewed appellant. Toscano described appellant as emotionally upset and exhausted. Shrum noticed abnormal eye movements, focusing difficulty and light sensitivity, and confusion. Shrum considered that appellant possibly was under the influence of a drug.

Appellant told the officers, "Oh, am I zonked out." After some discussion about his need for legal advice following *Miranda* warnings, appellant told the police he had driven down from Oregon, that his wife convinced him to free-base, that he had been at Oakcrest overnight, that his wife later took him to the motel, that he free-based all night with her, and that he killed her by hitting her four or five times with a bottle, and that "I had to choke her, I had to cut her throat."

Appellant said he killed his wife "somewhere in a dream on freebase and with her directing," that she could thus "leave and reenter," that "I hope you went where you wanted to," that he was being "tested" and "was trying to be accepted." "[I]t must have been necessary . . . my God. God, oh My God, honey, I hope, oh, don't say that." The interview ended shortly after appellant said, "What am I, what am I on, I can't think. . . ."

Shortly before 7 p.m., Officer Ben Harlan transported appellant to the community hospital. Appellant told Harlan, "I killed my wife but I'm not a killer. I've been married 29 years and loved her dearly." "When are you going to get [harm] me?" appellant asked. Harlan reassured appellant.

Community hospital admitting clerk Theresa Ledesma talked with appellant at 7:20 p.m. He seemed "spaced out" and told her his wife of 29 years "made me kill her." At times, she thought, he was incoherent.

Appellant was returned to jail that evening, where Officer Brian Reynolds was assigned to watch him. Reynolds described appellant as silent, very slow, extremely tired, and possibly dazed.

*Defense Evidence.* Appellant's defense consisted of testimony from four expert witnesses.

Clinical psychologist John Podboy concluded that when appellant killed his wife he was suffering from an acute toxic psychosis, a break with reality, induced by the prolonged free-basing of cocaine.[3] Dr. Podboy based his opinion on interviews with appellant, including one conducted on July 22, 1983, appellant's statement to the police, the preliminary hearing reporter's transcript, and other records in the case. The psychologist gave appellant personality tests but discounted their results because appellant was still despondent.

According to Dr. Podboy, during this psychotic episode, appellant operated under a delusional thought system acquired from his wife: that her death and, perhaps, his death and his children's deaths, would mean their ascendancy to a higher level of consciousness. The psychologist believed that Mary Anne Skinner, borrowing from various religions, created a personal theology to satisfy her own needs. Her psychological and pharmacological requirements were traced to two serious auto accidents in 1959, after which she became dependent upon prescription drugs and made a number of suicide attempts or gestures. By 1969, appellant introduced his wife to marijuana, which she preferred to prescribed medications.

In 1980, while appellant was confined in Lompoc for violating federal marijuana laws, Mrs. Skinner spent tens of thousands of dollars of the family savings on cocaine and also apparently dealt in the drug. Thereafter, she became increasingly concerned with death, which she explained would mark her ascendancy as a spiritual master. Ultimately, Podboy related, Mary Anne Skinner overcame appellant's resistance to cocaine use, and about six to eight weeks before the killing, she convinced him to seek salvation in free-basing.

Dr. Podboy viewed appellant's homicide as the direct product of his toxic psychosis. The psychologist's opinion was that appellant's will was impaired, that he could not maturely and meaningfully reflect upon his course of action, could not "reflect upon the act," and was unaware of his obligation to act within the general body of laws regulating society. Further, Podboy

---

[3]Dr. Podboy testified that this is not a diagnosis included in the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) of the American Psychiatric Association.

concluded, appellant could not understand the nature or quality of his act or distinguish right from wrong.

Conceding that, when arrested, appellant had become suicidal and had an awareness of what he had done, Podboy acknowledged: "[I]t's been extremely difficult for me to sort the thing out in my own mind and if I'm sounding like I'm equivocal. I just don't know. . . . I cannot accurately interpret the functioning of such a badly disordered brain and by that I'm referring to Mr. Skinner's state of mind at that time."

Asked whether appellant suffered a "settled" psychosis within the meaning of *People* v. *Kelly* (1973) 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875], which he read, Dr. Podboy testified: "Attempting to keep in mind what the court's definition of a settled versus an unsettled insanity or condition was, I'm really unable to render a solid opinion in this matter. I've thought a lot about it. I've read it and I guess I'm equivocal. I don't know. It's very difficult. I appreciate you providing me with that 1973 decision, but again keeping in mind the court's perameters [*sic*], I'm just unable to come to a firm conclusion in that regard."

Generally, Podboy "tend[ed] to think that there's a sound clinical basis for stating that someone can have a settled insanity" for "perhaps two, three, four, five weeks while someone is participating in binge substance abuse, and not be able to make a decision about how to extract themselves from it due to the fact that they have a settled form of insanity." Appellant was "actively psychotic" when seen on July 22, 1983, but three days later the signs of a psychosis were "very minimal," and, although "extremely depressed," appellant functioned reasonably well when seen on that date. By August 19, 1983, personality tests indicated appellant was not psychotic.

Psychiatrist Ronald Byledbal, who examined appellant on February 6, 1984, also concluded that he killed his wife during a cocaine-induced toxic psychosis. In that condition, according to the doctor, appellant could not separate reality from unreality, could not and did not premeditate, did not harbor malice, could not reflect meaningfully on his actions, was not aware of his obligations under the law, could not realize the evil in his action, and could not distinguish right from wrong or understand the nature and quality of his act.

Appellant's objective, Byledbal said, was to pass his wife's test by helping her "transcend into another plane." He said that he hit her on the head so she would feel no pain when he cut her throat. Appellant told Byledbal that he then left the motel with the purpose of providing the same assistance to his daughter.

Appellant told Byledbal that his first, relatively brief, post-free-basing psychotic episode occurred in Oregon shortly before his July 1983 trip to California. Appellant free-based for three days prior to that trip and for four days en route to California, he told the psychiatrist.

A cocaine psychosis usually lasts two to five days after cocaine is no longer active in the bloodstream, Byledbal explained. "[T]oxic psychosis [*sic*] are known for their waxing and waning much more at the further end of that two to five days . . .," he added, so that "[t]here could be times during the toxic psychosis that the person would be able to integrate certain actions or maybe certain realities." "Some people can be over a psychosis within hours, others can take days. It depends on the individual. . . . It can be dose related."

Dr. Byledbal could not identify the point in time at which appellant became psychotic before killing his wife, or determine when the cocaine psychosis ceased. "I did not examine him at the time he was arrested . . . . I do not exactly know when he ceased being psychotic . . . ." The doctor could state that appellant was certainly not psychotic when he examined him over six months after the crime, and that he exhibited no underlying mental disease. As a result of killing his wife, the doctor conceded, appellant could have experienced a stress-related reactive psychosis in addition to the toxic psychosis.

Another psychiatrist, Donald Apostle, interviewed appellant on January 24, 1984. Dr. Apostle agreed that appellant had suffered a "toxic cocaine psychosis" which would prevent deliberation or meaningful reflection or appreciation of the wrongfulness of his homicide. The psychiatrist felt, ". . . there has been in him a resentment about their marriage in regard to her drug usage, but I didn't think that figured in too much at the time of the killing." Instead, Dr. Apostle said, "I don't think he was harboring malice," but killed his wife "not so much as to make her dead but to allow her to somehow ascend in a mystical way to another universe, another plane of consciousness." Appellant told the alienist he felt his wife wanted him to kill her.

"Theoretically a toxic psychosis can exist after the effects of cocaine has [*sic*] worn off . . .," Dr. Apostle testified. In appellant's case, he added, "I think the overt psychosis, the severe psychosis ceased in my own mind [*sic*] somewhere within the first 24 hours." When appellant left the motel room, he began to realize what had happened. When he stopped his car on the highway, appellant was feeling both guilt ("the enormity of his action") and the effect of the cocaine. The psychiatrist noted that a psychotic person could experience guilt feelings.

Dr. David Smith, a physician specializing in clinical toxicology and addictionology, examined appellant on October 11, 1983. Appellant was not then psychotic. Based on his interview with appellant, review of case materials, and discussions with Dr. Podboy, Dr. Smith determined that appellant had suffered a "full-blown cocaine psychosis." Under a delusional system given direction by his wife, appellant could not premeditate, deliberate, harbor malice, reflect meaningfully on his actions, distinguish right from wrong, or understand the nature and quality of his actions at the time he did them. Dr. Smith testified that appellant was insane according to CALJIC No. 4.02[4] when he killed Mary Anne Skinner in order to elevate her to a higher plane.

Dr. Smith explained that cocaine psychosis does not result from a single dose, like a bad LSD trip, but results from chronic high dose intoxication over time.[5] Lack of sleep would greatly aggravate the condition. Dr. Smith's only information that appellant had used cocaine for six weeks came from appellant.

Dr. Smith did not know whether appellant was legally sane when he left Oakcrest on July 20, 1983. Nor could Dr. Smith determine exactly when, after the killing, appellant again became legally sane. The doctor could state that appellant remained psychotic until he encountered Officer Jaggie, and that such a psychosis usually clears within five to seven days.

## II. *Findings*

The trial court stated it was unable to find beyond a reasonable doubt that appellant premeditated and deliberated the killing and therefore found him not guilty of first degree murder. However, the court found him guilty of second degree murder because his mental condition did not remove his "freedom of choice or his ability to consider or decide on a course of action relating to the homicide." The court stated that even though the killing may have been part of an "elaborate delusionary sequence," it still was purposeful, which appellant "fully understood and appreciated." In other words, "The act was performed with one intent, to kill his wife regardless of what the defendant expected or believed would occur to his wife thereafter."

---

[4]CALJIC No. 4.02 (1982 revision) (see 4th ed. 1986 pocket pt.) states: "A person is legally insane if, by reason of mental disease or mental defect, either temporary or permanent, caused by the long continued use of [alcohol] [drugs] [narcotics], even after the effects of recent use of [alcohol] [drugs] [narcotics] have worn off, he [or she] was incapable of knowing or understanding the nature and quality of his [or her] act or of distinguishing right from wrong at the time of the commission of the offense."

[5]However, Dr. Byledbal described cocaine's "kindling" effect, a reverse tolerance acquired by a chronic user which may cause a psychotic reaction to a very small dose.

On the question of insanity the court made two findings. First, the court determined that appellant could distinguish right from wrong and/or understood the nature and quality of his act, noting particularly his grief, remorse, and demonstration of substantial understanding of what he had done almost immediately after the incident. Second, the court held that even if appellant came within the legal definition of insanity at the time of the killing, his psychosis, brought on by voluntary ingestion of drugs, was not "settled," and therefore did not excuse the act.

### III. *Discussion*

■ *Rejection of Insanity Defense.* The defense of insanity "shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act [or] of distinguishing right from wrong at the time of the commission of the offense." (Pen. Code, § 25, subd. (b); *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752].)

Appellant contends that he presented overwhelming evidence establishing this defense and that the trial court's decision to the contrary was not supported by substantial evidence. Because the burden was on the defense to show by a preponderance of the evidence that appellant was insane, before we can overturn the trier of fact's finding to the contrary, we must find as a matter of law that the court could not reasonably reject the evidence of insanity. (*People* v. *Drew* (1978) 22 Cal.3d 333, 348-349 [149 Cal.Rptr. 275, 585 P.2d 1318]; *People* v. *McCarthy* (1980) 110 Cal.App.3d 296, 300 [167 Cal.Rptr. 772].) Neither the law nor the record before us compels such a result.

While it is true that the expert witnesses, whose testimony we have summarized above, unanimously agreed that appellant was insane at the time of the incident, this is not determinative. "'However impressive this seeming unanimity of expert opinion may at first appear . . . our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the [court's] verdict of sanity . . . . [Citations.] It is only in the rare case when "the evidence is uncontradicted and entirely to the effect that the accused is insane" [citation] that a unanimity of expert testimony could authorize upsetting a . . . finding to the contrary.' [Citation.] Indeed [the Supreme Court has] frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion. [Citations.]" (*People* v. *Drew, supra,* 22 Cal.3d at p. 350; see Diamond,

*Criminal Responsibility of the Mentally Ill* (1961) 14 Stan.L.Rev. 59, 81, fn. 64.)

The value of expert testimony in assisting the trier of fact on the sanity question depends on the material from which the opinion is drawn and on the reasoning of the witness. (*Ibid.*) Here two of the witnesses (Drs. Byledbal and Apostle) interviewed appellant six months after the crime, and one, Dr. Smith, almost three months after. The court may well have concluded that their diagnoses were necessarily somewhat speculative. (See *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 230, fn. 8 [152 Cal.Rptr. 425, 590 P.2d 1] and accompanying text; Comment, *Admissibility of Psychiatric Testimony in the Guilt Phase of Bifurcated Trials: What's Left After the Reforms of the Diminished Capacity Defense?* (1984) 16 Pacific L.J. 305, 317 (hereafter Comment, *Admissibility of Psychiatric Testimony*).) Dr. Podboy, who testified at great length, interviewed appellant within a day of the crime, and he too believed that appellant was not capable of knowing or understanding the nature and quality of his act and of knowing right from wrong. However, he characterized this as "one of the most bizarre murder cases" with which he had been involved and conceded that he could not "accurately interpret the functioning of such a badly disordered brain." It was not unreasonable for the trial court to reject Dr. Podboy's conclusion of insanity.

Also, the court quite properly emphasized in its findings quoted above that even if appellant was operating within a delusional system, this would not necessarily compel a finding of insanity. It has been the law at least since M'Naghten's case that whether a defendant is responsible for a killing which occurs under an insane delusion depends on the nature of the delusion. (*People* v. *Skinner, supra,* 39 Cal.3d at p. 781, fn. 13.) For example, if the delusion is that another is about to take the defendant's life, and the defendant acts in self-defense, an insanity defense will prevail. But if the delusion is that the victim slandered the defendant, and the latter kills for revenge, it will not. (*Ibid.*) "The delusion first suggested . . . results in an inability to appreciate that the act is wrong. . . . The second delusion, without more, does not suggest that the defendant believes his act is lawful or morally justified." (*Ibid.*)

In *Skinner,* the defendant was laboring under a delusion that his marriage vows bestowed upon him a God-given right to kill his wife if she violated her vows, and that such killing was not wrongful because it was sanctified by the will and desire of God. (*Id.,* at p. 770.) The trial court had found that defendant could not distinguish between right and wrong, and the Supreme Court held that defendant was not guilty by reason of insanity because "a defendant who is incapable of understanding that his [or her]

act is morally wrong is not criminally liable merely because he [or she] knows the act is unlawful. [Citations.]" (*Id.*, at p. 783; see generally, Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey* (1966) 54 Cal.L.Rev. 1227 (hereafter Platt & Diamond).)

Here, it may be conceded that appellant harbored the delusion that after he killed his wife she would achieve a higher level of consciousness.[6] It does not follow that he thought the killing was legally permissible or morally compelled. There was ample evidence to the contrary in his behavior immediately after the crime. In particular, appellant changed out of his blood-stained pants, took money, drove from the crime scene, and then engaged in conduct on the freeway and made statements to the police exhibiting extreme remorse and a clear understanding of what he had done. We cannot say as a matter of law that the trial court erred in finding that, despite appellant's delusion, he was not legally insane when he killed his wife.

*"Settled Insanity."* The trial court's alternate basis for its finding of sanity based on *People* v. *Kelly, supra,* 10 Cal.3d 565, was equally sound. In that case, defendant voluntarily and repeatedly ingested drugs over a two-month period, which triggered a psychosis and rendered her unable to distinguish right from wrong. (*Id.*, at p. 569.) The trial court rejected her insanity defense to a charge of assault with a deadly weapon because her psychosis "'was not of a settled and permanent nature, and, in addition, was produced by the voluntary ingestion of hallucinatory drugs.'" (*Id.*, at p. 571, fn. omitted.) The Supreme Court reversed because the trial court's requirement that the condition be "permanent" was unduly restrictive. (*Id.*, at p. 576.) The court reasoned that although voluntary intoxication alone is no defense to a crime of general intent (Pen. Code, § 22), "'when insanity is the result of long continued intoxication, it affects responsibility in the same way as insanity which has been produced by any other cause.' [Numerous citations.]" (*Id.*, at p. 575.)

The court explained: "When long-continued intoxication results in insanity, . . . the mental disorder remains even after the effects of the drug or alcohol have worn off. The actor is 'legally insane,' and the traditional justifications for criminal punishment are inapplicable because of his [or her] inability to conform, intoxicated or not, to accepted social behavior.

---

[6]All the witnesses characterized appellant's belief as a "delusion," that is, a false belief that persists despite the facts (Webster's New Internat. Dict. (3d ed. 1970) p. 598), and there was no evidence to the contrary. Therefore, we accept that characterization for purposes of discussion, although we note that no one can tell whether the belief is really a false one and whether it is contrary to fact.

[Citation.] . . . The proper rule of law was early established . . .: '[S]ettled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause. *But it must be "settled insanity," and not merely a temporary mental condition produced by recent use of intoxicating liquor.*' (Italics added [by the *Kelly* court].) Thus it is immaterial that voluntary intoxication may have caused the insanity, as long as the insanity was of a settled nature and qualifies under the M'Naughton test as a defense." (*Id.,* at p. 576.)

The Supreme Court held that the trial court therefore erred when it required the defendant's insanity to be both settled and "permanent," and concluded that ". . . if defendant at the time of the offense was insane under the California M'Naughton test, it makes no difference whether the period of insanity lasted several months, as in this case, or merely a period of hours. [Citation.]" (*Id.,* at pp. 576-577, fn. omitted.) Appellant relies on the last phrase ("a period of hours") to support his claim that the trial court herein misapplied the settled insanity test. But that language had no relation to the facts in *Kelly,* and to the extent its dictum is inconsistent with the court's holding, it must be disregarded.

Presiding Justice Gardner explained the *Kelly* holding in *People* v. *McCarthy, supra,* 110 Cal.App.3d at pages 299-300: "Under *People* v. *Kelly* (1973) 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875], when an effort is made to establish insanity due to alcohol, it must be shown that there exists a 'settled insanity' and not the type of a temporary mental condition produced by current use of alcohol. In other words, your friendly local lush cannot get sloshed, commit a horrendous crime and slip into a state hospital free from criminal sanctions. If an alcoholic wants to use his [or her] problem as an escape hatch, he [or she] must drink enough to develop a mental disorder that continues when he [or she] is stone sober even though the damage is not permanent in the sense it is beyond repair. *Kelly* offers us the only escape from a completely absurd situation in which those who produce distorted mental conditions by the use of such mindbenders as acid, speed, angel dust or alcohol, then commit bizarre, dangerous and ugly acts could escape criminal sanctions on the basis that their self-induced mental conditions produced an incapacity to appreciate the criminality of their conduct. *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318] never intended any such outrageous conduct." (See also cases collected by Platt & Diamond, *supra,* 54 Cal.L.Rev. at pp. 1252, 1254.)

Dr. Podboy testified that cocaine has a very rapid half-life, so it would be excreted in a matter of hours after use. Nevertheless, he stated that the cocaine psychosis can last five to eight days after cessation of use of the

drug. He thought that appellant continued to be incapable of knowing right from wrong when he saw him on July 22, 1983, after appellant had been drug-free for 24 hours. Dr. Byledbal testified that according to medical literature, toxic cocaine psychosis can last two to five days. From this and other similar evidence, appellant argues that the trial court misapplied *Kelly* and erred when it found no settled insanity in his case.

We do not agree. Were we to accept appellant's theory, we would hold that insanity is "settled" if it lasts any longer than the time the drug which induces it remains in the defendant's body. We believe such a rule would violate the clear intent of *Kelly* and the venerable authority on which it is based. For example, in *People* v. *Travers* (1891) 88 Cal. 233 [26 P. 88], the court discussed the appropriate instructions on the point in this way: "[I]t is sufficient to say that settled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause. But it must be 'settled insanity,' and *not merely a temporary mental condition produced by recent use* of intoxicating liquor." (*Id.,* at pp. 239-240, italics added.) *Kelly* used and emphasized this same language in describing the rule under consideration. (*People* v. *Kelly, supra,* 10 Cal.3d at p. 576.)

There was substantial evidence presented to the trial court from which it could properly infer that appellant's condition, even if it could be characterized as "insanity," was merely a temporary one produced by recent use of cocaine. The court said, "[I]t appears logical that settled must mean fixed and stable for a reasonable duration and not solely dependent on the recent injection or ingestion and duration of the effects of the drug. Here the testified to psychosis is directly related to the recent ingestion and duration of the effect of the drug. The onset of the psychosis by the testimony of all the doctors was a result of the ingestion of the free base cocaine and the duration was transitory and related to the cessation of the drug's influence although it may have extended slightly beyond that influence for from five to seven days."

The court correctly applied the proper rule of law to the facts before it; its decision will not be disturbed on appeal.

## IV.  *Discussion**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante,* page 1050.

## V. *Conclusion*

Appellant claims that he was in a "psychological twilight zone," in a "tortured mental state," when he committed what the Attorney General refers to as "spiritual euthanasia." The trial court made its "most difficult decision," and found appellant legally responsible for his acts. That decision was supported by the evidence and the law.

The judgment is affirmed.

Scott, Acting P. J., and Merrill, J., concurred.

A petition for a rehearing was denied August 25, 1986, and appellant's petition for review by the Supreme Court was denied December 3, 1986.