Filed 4/17/13  P. v. Burchett CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LORI ANN BURCHETT,<br><br>        Defendant and Appellant. | E053584<br><br>(Super.Ct.No. RIF148998)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

        The petition for rehearing filed on April 2, 2013, is denied.  The opinion filed in this matter on March 19, 2013, is modified as follows:

        Remove footnote No. 1 on page 2.

        On page 14, preceding section 3, add:

        Defendant also contends the trial court not only had a sua sponte duty to give the second optional paragraph in CALCRIM No. 3450, but also that the trial court had a sua sponte duty to modify the instruction in order to explain the relationship between

1

defendant's use of marijuana and her bipolar disorder. "'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal . . . .' [Citation.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 81-82.) The optional paragraph in question accurately states the law. "If defendant believed the instruction required elaboration or clarification, [s]he was obliged to request such elaboration or clarification in the trial court." (*Id*. at p. 82.)

We also reject defendant's alternate claim that trial counsel was ineffective for failing to request the modification. The trial court instructed the jury that, "Addiction to or abuse of drugs or intoxicants *by itself* does not qualify as legal insanity." (Italics added.) Although not as clear as defendant would have liked, the jury would nevertheless understand from the emphasized language that defendant's marijuana use could be considered, along with evidence that defendant suffered a mental disease or defect, such as bipolor disorder, that was not the result of her voluntary use of drugs, in determining defendant's sanity at the time of the crimes. Therefore, failure to request the modification was not prejudicial. (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among other cases, *Strickland v. Washington* (1984) 466 U.S. 668 [ineffective assistance of counsel requires both deficient performance and resulting prejudice].)

These modifications do not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P.J.

We concur:

MILLER
J.

CODRINGTON
J.

3

**1**Filed 3/19/13  P. v. Burchett CA4/2 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| |
|---|
| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053584 |
| v. | (Super.Ct.No. RIF148998) |
| LORI ANN BURCHETT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.  Affirmed.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

---

**1**

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Meredith S. White, and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Lori Ann Burchett (defendant) appeals from the judgment entered after a jury found her guilty of the first degree murder of her 18-month-old son, Garrison, and rejected her defense that she was legally insane at the time of the killing. Defendant contends, first, that she proved she was legally insane by a preponderance of the evidence and, therefore, the jury erred in rejecting that defense. Next, defendant contends the trial court incorrectly instructed the jury on the defense of insanity. Finally, defendant contends two jurors engaged in misconduct when they communicated with each other about the case during the sanity phase of the trial and, therefore, the trial court abused its discretion when it declined to dismiss the jurors in question. We conclude no error occurred, and we will affirm the judgment.[2]

## FACTS

The facts of the underlying crime are undisputed. At trial, defendant conceded that she had killed her son, Garrison, then 18 months old, on the morning of February 23, 2009, by hitting the child on the head with a heavy gold cup and then stabbing him several times in the abdomen with an arrow defendant had removed from an art object hanging on the wall in her bedroom. Defendant, who did not appear in court before the

---

[2] Defendant also filed a petition for writ of habeas corpus in this court on August 10, 2012. (Case No. E055510.) The petition will be decided by separate order.

2

jury during either the guilt or sanity phases of trial, contended the killing was not premeditated. Defendant also claimed that she was legally insane at the time she killed her son. Both psychiatrists who evaluated defendant testified at the sanity phase of the trial that at the time she killed Garrison, defendant was in the throes of a psychotic break. We will recount that evidence in detail in our discussion of defendant's challenge to the jury's verdict finding her sane.

During the guilt phase of the trial, defendant's 15-year-old son, Nick,[3] testified that on Sunday, February 22, 2009, he had stayed overnight with defendant (his mother), Greg, Sr., (defendant's current husband; hereafter Greg Sr.), and their two sons, Greg, Jr., (five years old; hereafter Greg Jr.) and Garrison (18 months old). Nick had slept on the couch. When he awoke on the morning of February 23, 2009, defendant immediately accused Nick of smoking crack because she had smelled it on his keys. Nick denied the accusation and was upset because defendant had made that same accusation two other times over the weekend. Greg Sr., a biology professor at Riverside Community College, had gone to work and had taken Greg Jr. to day care by the time Nick woke up.

While defendant washed dishes, Nick played with Garrison. Defendant then sat down at the dining table to do paperwork. When she stood up, Nick told her that she had blood running down her leg. Defendant said she knew and asked Nick to watch Garrison while she took a shower. Although she had asked Nick to watch Garrison, defendant took the infant with her into the bedroom.

---

[3] Nick is defendant's son from a previous marriage.

3

Nick watched a movie. After about 45 minutes, he leaned into defendant's bedroom and asked if he could come in. Defendant said no, she would be out in a minute. Nick heard water running in the shower and could tell from the sound of defendant's voice that she was in the bathroom. At some point, Nick heard what sounded like a hit or a thump from a fall, but it was not significant enough for him to investigate. Nick asked defendant again whether he could come into the bedroom about 15 to 30 minutes after making the first request. Again, defendant said she would be out in a minute. Nick still heard water running in the shower.

Nick got the feeling something was not right. He walked into defendant's bedroom, this time without asking permission. He saw blood on the floor. Nick found Garrison on the bed, his body completely covered by a blanket except for one foot. Nick lifted the blanket and saw Garrison's body, bloodied and bruised; the infant's intestines were extruding from his belly button. On the bed, there was a gold cup that had dried blood on it. There was blood on the bedsheets.

Nick started to scream and pounded on the bathroom door. He could hear the shower water running. Defendant ran out of the bathroom, naked. Her face and lips were bluish-purple. When Nick asked defendant what had happened, she told him "everything is fine" and that she had "set him free." Defendant seemed angry at first and then calmed down. She told Nick that she had to pick one of his brothers or one of the three boys. Defendant got her cell phone, looked at it for a minute, and then told Nick she would die if he did not leave her alone. Defendant told Nick not to talk to her; she went back into

4

the bathroom and closed the door. When Nick tried to talk with defendant, she told him to leave her alone.

Not knowing what to do, and afraid to call the police, Nick waited until his stepfather, Greg Sr., returned home that evening with Greg Jr. Nick did not tell Greg Sr. what had happened. Greg Sr. knew that defendant could be moody, and it was best to leave her alone at those times. That morning, defendant and Greg Sr. had a disagreement about whether Garrison should go to day care: Greg Sr. wanted him to go, but defendant wanted the child to stay home with her. Greg Sr. gave in. Before he left the house to go to work, he put Garrison in bed with defendant. Although he was surprised defendant had not come out of the bedroom to greet Greg Jr., Greg Sr. made dinner and then left around 9:00 p.m. to see a movie. When Greg Sr. returned to the house around 11:00 p.m., he asked Nick what had happened, because the boy looked very sad. When Nick said he thought "Mom did something bad" and that he thought she had hurt Garrison, Greg Sr. went into the bedroom where he found his infant son's body.

Greg Sr. banged on the bathroom door. When defendant did not come out, he used a screwdriver to pick the door lock. The bathroom was dark, and water was running in the shower. When Greg Sr. turned on a light, defendant's hand hit the glass shower door from inside. Greg Sr. opened the shower door and found defendant sitting on a bench under the running water. When he asked defendant what had happened, she gave him an emotionless, cold stare. Then with a very slow, methodical movement, defendant closed the shower door. According to Greg Sr., defendant's stare was a "cold, dead, evil

5

look." Greg Sr. called 911. He also called Nick's father, who took Nick and Greg Jr. to his home.

When the police arrived, defendant was still in the shower, where she had been for nearly nine hours. According to Officer Adcox, when he opened the shower door, defendant tried to close it and would not get out because she said she needed to be alone. Officer Adcox described defendant as having a "thousand yard" stare; "she just was looking right through me, like no-one-was-home type thing." After about a minute, defendant complied with the officer's directive that she get out of the shower. When Officer Adcox handed defendant a robe, she tried to grab his gun. Officer Adcox trapped defendant's hands and placed her in a modified choke hold until she went limp and could be handcuffed. Defendant again tried to grab Officer Adcox's gun after she was in handcuffs. As the police escorted her from the house and to a police car, defendant said that her husband had nothing to do with Garrison's death.

According to the forensic pathologist who conducted the autopsy, Garrison's skull was fractured on the left side of his head. The skin over the fractured area of the skull was bruised and had an imprint consistent with the gold cup or chalice found near the infant's body. Garrison also had multiple stab wounds in his abdomen. The pathologist removed an arrowhead from one of those wounds. Nine puncture wounds on Garrison's back corresponded with the stab wounds on his abdomen. In the pathologist's opinion, Garrison died as a result of the combined injuries.

6

Additional facts will be recounted below as pertinent to our resolution of the issues defendant raises in this appeal.

## DISCUSSION

## 1.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT SANITY VERDICT

The jury found defendant guilty of both first degree murder and assault on a child resulting in death. In the sanity phase of the trial, both expert witnesses agreed defendant was legally insane at the time of the killing, but Dr. Oshrin, the psychiatrist retained by the trial court, expressed the opinion that defendant's psychosis was the result of her chronic use of marijuana. Defendant's expert witness, Dr. Resnick, initially formed the opinion that defendant suffered from a psychosis not otherwise specified that was marked by grandiose and paranoid delusions. Shortly before he testified at trial, Dr. Resnick added a diagnosis of bipolar disorder, which he believed defendant had suffered from most of her adult life. The jury found defendant was sane at the time of the killing, thus presumably relying on Dr. Oshrin's opinion, or at the very least the evidence regarding her marijuana use, because, as the trial court instructed the jury, the defense of insanity is not available if the defendant's mental disease or defect or temporary mental condition is the result of voluntary drug use. (See Pen. Code, § 25.5; CALCRIM No. 3450.)

Defendant contends in this appeal that she proved by a preponderance of the evidence that she was legally insane at the time she killed Garrison. Defendant further contends, because she had the burden of proof the standard that applies to review the

7

sufficiency of the evidence is whether, as a matter of law, the jury could not reasonably have rejected the evidence of insanity. We do not share defendant's view regarding the standard of review.

Defendant bases her claim regarding the standard of review on *People v. Skinner* (1986) 185 Cal.App.3d 1050 (*Skinner*), in which the trier of fact, in that case the court, rejected the defendant's insanity defense and found the defendant sane. The defendant challenged that finding on appeal. In addressing the issue our colleagues in Division 3 of the First District Court of Appeal stated, "Because the burden was on the defense to show by a preponderance of the evidence that [defendant] was insane, before we can overturn the trier of fact's finding to the contrary, we must find as a matter of law that the [trier of fact] could not reasonably reject the evidence of insanity." (*Id*. at p. 1059.) To support that statement, the *Skinner* court cited *People v. Drew* (1978) 22 Cal.3d 333 (*Drew*), in which the prosecution had not presented any evidence during the sanity trial but the jury nevertheless found the defendant sane. (*Id*. at p. 351.) Recognizing that the defendant has the burden of proof on the issue of sanity, the Supreme Court in *Drew* observed, "[I]f neither party presents credible evidence on that issue, the jury must find [the defendant] sane. Thus the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it." (*Ibid*.)

Contrary to the *Skinner* court's apparent view, the Supreme Court did not create a different test in *Drew* for determining the sufficiency of the evidence to support a sanity

8

finding. Instead, it explained how, when the prosecution does not present any evidence on the issue of sanity, a jury nevertheless could find the defendant sane: The jury could reasonably reject the defendant's evidence of insanity. When, as in this case, both sides present evidence on the issue of sanity, appellate review of the jury's verdict or finding on that issue is subject to the same standard applicable to the jury's resolution of any issue involving conflicting evidence—we review the record to determine whether the verdict or finding is supported by any credible, substantial evidence. (See *People v. Belcher* (1969) 269 Cal.App.2d 215, 219-220.)

In the sanity phase of this case, the prosecution presented evidence to show defendant's psychosis on the day she killed Garrison was the result of her having voluntarily smoked marijuana on a regular basis for the better part of the preceding year. Defendant's husband, Greg Sr., testified that defendant had obtained a medical marijuana prescription in May 2008. After she obtained the prescription, defendant's marijuana use increased and by the time she killed Garrison, defendant was smoking marijuana daily. She consumed, on average, an ounce of marijuana every two to three days, an ounce being equivalent to eight "joints." Defendant ingested the drug, smoked it directly, and inhaled the smoke through a vaporizer device. A toxicologist testified that blood collected from defendant on February 25, 2009, at 6:00 p.m., nearly 41 hours after defendant was taken into custody, tested positive for THC, the psychoactive ingredient in marijuana.

Based on the evidence of defendant's marijuana use, the jury could find she was sane at the time of the killing because the defense of insanity is not available to a person whose psychosis results from the voluntary use of drugs. In short, we are unable to say in this case that the prosecution's evidence was insufficient as a matter of law to support the jury's sanity finding.

In reaching this conclusion, we acknowledge the apparent weaknesses in the testimony of Dr. Oshrin. As defendant points out, Dr. Oshrin spent only one hour 30 minutes with defendant, whereas her expert witness, Dr. Resnick, conducted an evaluation of defendant that lasted seven hours 40 minutes.[4] Dr. Oshrin could not recall whether he had read any of defendant's medical records, although he had read the voluminous police reports as well as the letters defendant had written. Dr. Resnick, on the other hand, had reviewed defendant's medical and mental history, beginning with the medical records of Dr. Redder-Haga, a family physician, whom defendant consulted in November 2007 regarding knee pain as well as anxiety and anger issues, through the records of Dr. Reantaso, a psychiatrist who treated defendant on February 25, 2009, when

---

[4] In that interview, defendant acknowledged, among other things, that she had always been moody, irritable, angry, and that she also had bouts of depression. But on February 3, 2009, defendant had what she described as a religious epiphany after a yoga class and as a result believed that God was directing his attention to her. Defendant believed God was talking to her through songs played on a radio station as well as through commercials. Defendant wrote the events down on a scroll. Defendant believed her actions were being directed by God. In the morning of the day she killed Garrison, defendant had interpreted a pattern made by her menstrual blood as a command from God to kill her two youngest children. Before she killed Garrison, defendant conducted a computer search for cruise tickets she could buy in order to "gain safe passage."

10

she was transferred from the jail to a hospital for psychiatric treatment. Dr. Oshrin also acknowledged that marijuana induced psychosis is uncommon, but he nevertheless saw one or two cases each year.

The purported weaknesses do not compel a conclusion, as a matter of law, that Dr. Oshrin's testimony is not credible and, therefore, does not support the jury's sanity finding. The jury was aware of the differences between Dr. Resnick and Dr. Oshrin, not only in background, education, and experience, but also in the basis for their respective opinions. Despite those differences, the jury nevertheless could believe Dr. Oshrin's opinion that defendant suffered from a marijuana induced psychosis as a result of which the insanity defense was not available to her.

For the reasons discussed, we must reject defendant's first claim of error in this appeal.

## 2.

## INSTRUCTION ON INSANITY DEFENSE

Defendant contends the trial court's instructions to the jury were incorrect, or at least incomplete, because the trial court only gave the first paragraph of CALCRIM No. 3450, when it should have given both paragraphs. Once again, we disagree.

The trial court instructed the jury according to CALCRIM No. 3450 that defendant has the burden to prove by a preponderance of the evidence, i.e., that it is more likely than not, that she was legally insane at the time she committed the crimes. "The defendant was legally insane if: [¶] 1. When she committed the crimes she had a mental

11

disease or defect, and [¶] 2. Because of that disease or defect, she did not know or understand the nature and quality of her act or did not know or understand that her act was morally or legally wrong. [¶] None of the following qualify as a mental disease or defect for purposes of an insanity defense: Personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts."

CALCRIM No. 3450 also includes two optional paragraphs that apply when there is evidence of drug or alcohol use. The trial court instructed the jury according to the first optional paragraph as follows: "Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants by itself does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity."

The trial court did not give the second optional paragraph in CALCRIM No. 3450, which states: "If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off."

12

The trial court did not instruct the jury according to the second paragraph because defense counsel told the trial court, when asked, that she was not requesting the second paragraph be included in the jury instruction.[5] On appeal, defendant now contends the trial court should have given both paragraphs of the instruction and that failure to do so was prejudicial.

Although we are inclined to agree with the Attorney General that if error occurred it was invited, we will not discuss that issue further. In our view, the evidence did not support giving the second quoted paragraph because there was no evidence that defendant suffered from "a settled mental disease or defect caused by the long-term use of drugs." At trial, defendant presented evidence to show that she was bipolar, a mental disease from which she claimed to have suffered for many years before she was actually diagnosed in February 2009. There was no evidence presented at trial to show that in addition to being bipolar defendant also had a settled mental disease brought on by her use of marijuana. Because there was no evidence to support instructing the jury according to the second bracketed paragraph, we must reject defendant's claim that the trial court erred in failing to include that paragraph in its instruction to the jury.

For this same reason, i.e., the absence of evidence to support giving the instruction, we must also reject defendant's alternate assertion that she was denied her state and federal constitutional right to the effective assistance of counsel as a result of

_____

[5] Defense counsel had objected to including either of the optional paragraphs in the trial court's jury instruction.

13

trial counsel objecting to the second bracketed paragraph.  In short, and simply stated, the evidence did not warrant instructing the jury according to the legal principle set out in the second bracketed paragraph in CALCRIM No. 3450.

**3.**

**JUROR MISCONDUCT CLAIM**

Defendant contends the trial court erred when it concluded that two jurors had not committed misconduct by communicating with each other during trial.  We disagree.

The pertinent facts are not in dispute.  When court recessed for the day on February 1, 2011, defense counsel reported that Jurors Nos. 10 and 11 had been communicating with each other during testimony by looking at each other and nodding their heads as if to say, "'Told you so.'"  It also looked as if Juror No. 10 had written something on his notepad, which he then showed to Juror No. 11.  Defense counsel had asked the bailiff to keep an eye on the two jurors.  The bailiff confirmed what defense counsel had observed—on more than one occasion during the testimony of the defense expert witness Juror No. 10 wrote on his pad, showed what he had written to Juror No. 11, and then the two exchanged looks and nodded their heads.  The trial court, with the concurrence of the attorneys, agreed to speak with the two jurors.

The next morning, the trial court first questioned defense investigator Elia Joseph, who testified that although she had not seen them interact the previous day, on another day during the testimony of Dr. Reantaso, she twice saw Juror No. 10 write something after which he laughed or smiled, and then pointed out what he had written to Juror

14

No. 11.  According to Investigator Joseph, the first time Juror No. 11 seemed reluctant to look, but the second time she leaned over and read what Juror No. 10 had written and then smiled and kind of concurred.

Defense counsel told the trial court that the previous day when the prosecutor asked a question about the comment Nick had made regarding defendant having to choose one of her children, Juror No. 10 "kind of lit up.  And they looked at each other, nodded their head[s] with just a smiling, as if a point had been made that they had discussed.  He [Juror No. 10] wrote on his pad.  Leaned it over to her [Juror No. 11].  And she kind of smiled or had a quizzical look on her face regarding whatever it was they were discussing."  That is when defense counsel asked the deputy to keep an eye on the two jurors.

The trial court then questioned Juror No. 11.  The trial court explained it had come to the court's "attention that on possibly two occasions, one when Dr. Reantaso was testifying and one occasion yesterday when Dr. Resnick was testifying, that you and Juror No. 10 may have been communicating about the testimony.  The information that I have is that when Dr. Reantaso was testifying, [Juror] No. 10 wrote something down on his notebook and showed it to you.  And then the two of you laughed about it or smiled, reacted.  And then yesterday when Dr. Resnick was testifying, sometime near the end of the day, again Juror No. 10 wrote something down on his notebook.  He also looked at you and gestured in a way.  The information I have is that the gesture was sort of like, see, this is what we talked about or, see, this is what we said.  And it appeared that there

15

had been a point made based on maybe a discussion that you had during deliberation. So I'm concerned about that. And I wanted to ask you about your side of this and what you saw."

When the trial court asked specifically whether Juror No. 11 and Juror No. 10 had communicated at all during the testimony of Dr. Reantaso, Juror No. 11 answered, "Not—no." Juror No. 11 also denied that Juror No. 10 had shown her anything he had written in his notebook or that they had communicated in any way about the testimony of Dr. Reantaso. According to Juror No. 11, "All he said was he was hot. But nothing about a case." When the trial court asked about the previous day and whether she and Juror No. 10 were communicating with each other during the testimony of Dr. Resnick "when there was some discussion about parents not liking their kids," Juror No. 11 said, "No." Juror No. 11 also denied that she had communicated with Juror No. 10 about the facts of the case except when they were in deliberations. When asked if Juror No. 10 had written anything in his notebook and shown it to her, Juror No. 11 said, "Nothing specific that I remember."

After conferring with counsel, the trial court told Juror No. 11 that other people in the courtroom had reported that she and Juror No. 10 had been communicating with each other by "gesturing, smiling, shaking your head." Juror No. 11 answered, "Most of the time it's not—I don't look at the notebooks. He fidgets a lot with his legs because he has long legs. So I'm just looking at his legs. He put them in the cubbyhole. He takes them out. He's tall so he gets uncomfortable. So that's what I looked at, not his lap or

16

anything like that. So they—might have been looking at something wrong, but has nothing to do with what he's writing but how he's moving his legs around in the cubbyholes and under the cubbyholes." Before letting Juror No. 11 go, the trial court asked if she could continue to be fair and impartial in the case. Juror No. 11 said, "Yes, I think I can."

The trial court then questioned Juror No. 10, who was the foreperson in the guilt phase of the trial. As she had with Juror No. 11, the trial court explained to Juror No. 10 it had come to the court's attention that during Dr. Reantaso's testimony on Monday, and then again the previous day during questioning of Dr. Resnick that "you and Juror No. 11 may have been communicating or gesturing regarding the testimony. Specifically yesterday afternoon there was some testimony regarding Nick and Nick's statement during his testimony that [defendant]—his mom told him she had to pick one of them. And the information that I have from people in the courtroom was that at that point, you may have been writing something down in your notebook and showing it to No. 11 or communicating about the testimony." The trial court then asked whether Juror No. 10 remembered "having any kind of communication with [Juror] No. 11" during the testimony of Dr. Reantaso "regarding that testimony, either gesturing to her or smiling to her, or writing anything down at all?" Juror No. 10 answered, "Well, yeah, absolutely, I write. If you look at my flip chart, there's a lot of notes in there." Juror No. 10 then said "[N]o, there was not any gesturing between us or, you know—I mean, people are reading what I'm writing, I'm not intentionally showing them what I want them to hear. I write

17

my own notes. I have my own way of taking notes." The trial court then expressly asked whether Juror No. 10 was communicating in any way with Juror No. 11 during Dr. Reantaso's testimony. Juror No. 10 said, "No."

The trial court asked Juror No. 10 whether during the testimony of Dr. Resnick, he recalled "having any kind of communication, whether verbally or physically[,] with [Juror] No. 11," and when Juror No. 10 asked the trial court to explain, the court asked, "Did you show her something you'd written down in your book?" Juror No. 10 answered, "No, I don't make it—no. I don't show—I mean, like I said, it's sitting in my lap. I write stuff down. If there's something that strikes me, then—I don't know how [to] put it. If something strikes me—I don't write—I guess the way my body language is, I may get kind of like, whoa, yeah there is a point. But I don't make it a point to show it to anybody, like, hey, look. This is a point you should see."

The trial court then asked whether he was uncomfortable in the chair because of his long legs, and Juror No. 10 explained that his knees get cramped, that he is always moving his chair around and bumping Juror No. 11. After first indicating she would try to get him a different place to sit where he could stretch his legs, the trial court asked Juror No. 10 if there was any reason he could not be fair and impartial. Juror No. 10 said, "No."

The trial court then questioned Dr. Vasilis Pozios, a colleague of Dr. Resnick, who had been in court to observe the trial in general and specifically to observe Dr. Resnick's testimony. Dr. Pozios testified that he had been taking detailed notes of everything going

18

on during the trial and he "couldn't help but notice that the two jurors in question communicated to each other on at least three occasions . . . both nonverbally and once there was a verbal exchange between the two of them." According to Dr. Pozios, the first nonverbal exchange occurred on Monday during the direct testimony of Dr. Resnick. Dr. Pozios made a notation that Jurors Nos. 10 and 11 "looked at each other and smirked when the topic of killing one son, not two, was discussed." The second nonverbal exchange took place during the second day of Dr. Resnick's direct testimony. "The two jurors in question looked at each other when the topic of the defendant being struck by a flashlight was discussed." When asked to describe how they looked at each other, Dr. Pozios stated, according to his notes, that Juror No. 11 had a look of disgust on her face and then the two jurors looked at each other. Dr. Pozios noted that during cross-examination of Dr. Resnick, Juror No. 10 and Juror No. 11 looked at each other three times—the first time during the topic of the review of other doctors' records; next, Jurors Nos. 10 and 11 looked at each other in disbelief after Dr. Resnick testified that he based his opinion on the observations of a nurse practitioner who had treated defendant, but not on her opinion that defendant is bipolar; and then yesterday afternoon when Dr. Resnick was "talking about the analogy of Abraham killing his sons on an order from God but having feelings about killing his sons. [Dr. Pozios had] noted that the two jurors looked at each other during that explanation." During the testimony of defendant's 15-year-old son regarding the number of sons defendant was instructed to kill, Dr. Pozios noticed

19

"some strong facial expressions between the jurors and . . . also a verbal communication, looked like one or two words from [Juror No. 10 to Juror No. 11]."

Finally, the trial court questioned Juror No. 12 to see whether that juror had noticed any communication, mostly nonverbal like gesturing, smirking, laughing, going on between Juror No. 10 and Juror No. 11. Juror No. 12 had not seen anything like that, even though, as the juror put it, "I'm kind of facing this way," presumably meaning that Juror No. 12 faced toward the two jurors in question. Juror No. 12 had only seen "maybe a bump of a seat and an, 'Oh, I'm sorry,' but . . . no smirking or any of that . . . ."

After excusing Juror No. 12, the trial court acknowledged that there had been "some sort of interaction between" Jurors Nos. 10 and 11. But the trial court could not determine whether the communication was improper or "very innocent," such as regarding Juror No. 10 being uncomfortable. Because Juror No. 12, whom the trial court viewed as the most helpful witness due to proximity, had not heard or seen anything, the trial court found that Juror No. 10 and Juror No. 11 had not engaged in misconduct, and even if they had, there had been no showing of actual prejudice. Therefore, the trial court denied defendant's motion to remove Juror No. 10 and Juror No. 11. Instead, the trial court again admonished the entire jury not to communicate about the case with each other until the close of evidence and they were in deliberation.

Defendant contends the trial court abused its discretion in finding that Juror No. 10 and Juror No. 11 had not engaged in misconduct because, at the very least, the two jurors had been dishonest when they denied they had communicated with each other during

20

trial. Defendant points out, and the trial court acknowledged, that four people had seen the two jurors communicate nonverbally with each other, and three of the four testified that they had seen Juror No. 10 write something in his notepad, which he then showed to Juror No. 11. Defendant contends the jurors at the very least engaged in misconduct by being untruthful, and such juror misconduct gives rise to a rebuttable presumption of prejudice. We do not share defendant's view.

Under Penal Code "section 1089 the trial court may discharge a juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty,' and once put on notice that good cause to discharge a juror may exist, the court has a duty to make whatever inquiry reasonably is necessary to determine whether the juror should be discharged. [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1351.) "[T]o establish juror misconduct, the facts must establish '"an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality."' [Citations.]" (*Ibid.*) "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sound discretion of the trial court. [Citation.] If any substantial evidence exists to support the trial court's exercise of its discretion pursuant to [Penal Code] section 1089, the court's action will be upheld on appeal. [Citation.]" (*Ibid.*)

Defendant did not base her misconduct claim in the trial court on the fact that the jurors had been dishonest in their responses. As a result, the trial court did not address

21

that issue. The record suggests that neither Juror No. 10 nor Juror No. 11 was particularly forthcoming. However, they each answered the specific questions asked of them, with the possible exception of whether they had communicated with each other in any manner during the trial. It is apparent from the record that the two jurors did communicate, but the subject of their communication is not clear. The jurors could reasonably have construed the trial court's question as being limited to communication about the case. Because defendant did not raise the issue of the jurors' honesty, the possibility that they had misunderstood the question was not developed in the trial court. Consequently, we are unable to determine whether the jurors lied, and thereby committed misconduct, or simply misunderstood the trial court's question.

Because the record supports the trial court's finding that the jurors had not communicated with each other about the case, we must affirm the trial court's finding that the two jurors in question had not committed misconduct.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P.J.

We concur:

MILLER
J.

22

<u>CODRINGTON</u>

J.